ACCEPTED
01-18-00023-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
5/25/2018 4:35 PM
CHRISTOPHER PRINE
CLERK

No. 01-18-00023-CV
In the Court of Appeals for the
First District of Texas at Houston, Texas

—————————————————————————

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
5/25/2018 4:35:55 PM
CHRISTOPHER A. PRINE
Clerk

In the Interest of J.I.G. & A.D.G., Children

————————————————————————

**D.C.G., Appellant**

**v.**

**Department of Family & Protective Services, Appellee**

—————————————————————————

On appeal from the Harris County District Court
315th Judicial District; No. 2016-03202J

—————————————————————————

**APPELLEE'S BRIEF**

—————————————————————————

VINCE RYAN
COUNTY ATTORNEY
State Bar #99999939
Sandra D. Hachem (SBN 08667060)
Sr. Assistant County Attorney
1019 Congress, 17th Floor
Houston, Texas 77002
Telephone: (713) 274-5293
Facsimile: (713) 437-4700
Email: sandra.hachem@cao.hctx.net
ATTORNEY FOR APPELLEE,
DEPARTMENT OF FAMILY &
PROTECTIVE SERVICES

# TABLE OF CONTENTS

INDEX OF AUTHORITIES ................................................................................ iii

PARTY NAME SUBSTITUTIONS ................................................................... iv

RECORD ABBREVIATIONS ............................................................................ iv

STATEMENT OF THE CASE ............................................................................. v

REPLY POINT ..................................................................................................... v

STATEMENT OF FACTS .................................................................................... 1

SUMMARY OF ARGUMENT ........................................................................... 24

ARGUMENT AND AUTHORITIES ................................................................. 27

**REPLY POINT ONE:  The evidence sufficiently supported the court's findings for termination of the father's parental rights** .................................. **27**

> **I. Applicable Law and Standard of Review** .............................................. **27**

> **2. Father's pattern of criminal behaviors, abuse of the children under his care and neglect supported the court's findings under Subsections D and E of Section 161.001(b)(1) of the Family Code.** ............................... **29**

> **3. The evidence sufficiently supported the court's finding under Subsection O of Section 161.001(b)(1) of the Family Code.** .................. **35**

> **4. The evidence supporting the court's findings under Subsections D, E, and O of Section 161.001(1) of the Family Code adequately supported the court's finding that termination was in the child's best interest** ... **41**

PRAYER FOR RELIEF ...................................................................................... 47

CERTIFICATE OF SERVICE ........................................................................... 47

CERTIFICATE OF WORD COUNT COMPLIANCE ...................................... 48

APPENDIX ............................................................................................ (attached)

## INDEX OF AUTHORITIES

**CASE**                                                                                           **PAGE**

*In re A.V.*, 113 S.W.3d 362 (Tex. 2003) ..................................................35

*In re B.B.,* 971 S.W.2d 160 (Tex. App.—Beaumont 1998, pet. denied). ............... 30

*In re C.H.,* 89 S.W.3d 17 (Tex.2002) ....................................................28

*In re D.R.A.,* 374 S.W.3d 528 (Tex.App.—Houston [14th Dist.] 2012, no pet.) ....................................................................28

*In re E.C.R.*, 402 S.W.3d 239 (Tex. 2013) ...........................................35

*In re H.M.O.L.*, No. 01-17-00775-CV, 2018 WL 1659981 (Tex. App. – Houston [1st Dist.] 2018, pet. denied) .............................................34

*Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976), ....................................................41

*In re J.F.C.,* 96 S.W.3d 256 (Tex.2002) .......................................28, 29, 39

*In re J.M.T.,* 519 S.W.3d 258 (Tex. App. – Houston [1st Dist.] 2017, pet. denied)..................................................................38

*In re J.O.A.,* 283 S.W.3d 336 (Tex.2009).......................................................28, 29

*Jordan v. Dossey*, 325 S.W.3d 700 (Tex. App. – Houston [1st Dist.] 2010, pet. denied ..................................................................33, 46

*In re K.N.D.*, No. 01-12-00584-CV, 2014 WL 3970642 (Tex. App.—Houston [1st Dist.] Aug. 14, 2014, no pet.). ..........................39, 40

*In re L.G.R.*, 498 S.W.3d 195 (Tex. App. – Houston [14th Dist.] 2016, pet. denied)..................................................................46

*In re M.M.M.*, Nos. 01-17-00980-CV, 2018 WL 1954178 (Tex. App. – Houston [1st Dist.] 2018, no pet. h.) .............................................34

*In re T.M.*, No. 01-16-00942-CV, 2017 WL 1885406 (Tex. App. – Houston [1st Dist.] 2017, pet. denied) (mem. op.). .......................42

*Texas Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531 (Tex.1987)..................30, 32

*In re V.V.*, 349 S.W.3d 548, 555 (Tex. App. – Houston [1st Dist.]
  2010, pet. denied)........................................................................................32

*Vasquez v. Tex. Dept. of Prot. & Reg. Servs.*, 190 S.W.3d 189
  (Tex. App. – Houston [1st Dist.] 2005, pet. denied) ...............................34

## STATUTES

Tex. Fam. Code Ann. § 101.007 (West 2014)........................................................28

Tex. Fam. Code § 161.001(b) (West 2015) ...........................................27, 28, 35, 41

Tex. Fam. Code Ann. §263.307 (West 2014)....................................................41, 46

## RULES

Tex. R. Civ. P. 306...............................................................................................iv

### PARTY NAME SUBSTTUTIIONS

| Substitution | Description |
| --- | --- |
| John | J.I.G., oldest child of Mother and Father |
| Angela | A.D.G., middle child of Mother and Father |
| Grace | G.M.G., youngest child of Mother and Father (not in this suit) |
| Amanda | Mother |
| Daniel | Father/Appellant |

### RECORD ABBREVIATIONS

| Abbreviation | Description |
| --- | --- |
| CR | Clerk's Record from 2016-03202J |
| CR-Appendix | Appendix to Clerk's Record from 2016-03202J |
| RR-2 | Volume 2 of 5 |
| RR-3 | Volume 3 of 5 |
| RR-4 | Volume 4 of 5 |
| RR-5 | Volume 5 of 5 |

## STATEMENT OF THE CASE

On May 24, 2016, the Texas Department of Family and Protective Services ("Department") filed a child protection suit regarding John and one of his younger siblings, Angela. CR p. 5. The court signed an order that same day granting the Department temporary sole managing conservatorship of John and Angela. CR-Appendix Tab 1.

On December 19, 2017, the judge of the court signed a judgment previously approved by the Associate Judge. CR 212. The judgment declared Daniel to be the father of the children and terminated his parental rights and Amanda's as well as appointing the Department as sole managing conservator. CR p. 204. Per Tex. R. Civ. P. 306, the judgment recited that the parents' rights were terminated on the findings that termination was in the children's best interest and Subsections D, E and O of Section 161.001(b)(1) of the Family Code. Daniel filed a notice of appeal January 9, 2018, 21 days after the judgment was signed. CR p. 238.

## REPLY POINT

**The evidence sufficiently supported the court's findings for termination of the father's parental rights**

No. 01-18-00023-CV
In the Court of Appeals for the
First District of Texas at Houston, Texas
_____

In the Interest of J.I.G. & A.D.G., children
_____

**D.C.G., Appellant**

**v.**

**Department of Family & Protective Services, Appellee**

_____

On appeal from the Harris County District Court
315th Judicial District; No.2016-03202J

_____

**APPELLEE'S BRIEF**
_____

TO THE HONORABLE JUSTICES OF THE COURT OF APPEALS:

Department of Family & Protective Services, Appellee, [hereinafter "Department"] submits this brief in response to the brief of the father, DCG, hereinafter "Daniel"

## STATEMENT OF FACTS

Amanda and Daniel are the parents of two children, John (born 2012) and Angela (born 2014). RR-5 p. 143. In 2003, several years before the children were born, Daniel was the subject of a sexual assault felony. RR-5 p. 149. In 2011, he

1

was convicted for failure to register as a sex offender. RR-5 p. 149. On September 27, 2012, shortly after John was born, Daniel was again convicted for failing to register. RR-5 p. 155-56. Though sentenced to two years jail time, Daniel was apparently allowed to serve community supervision, because a judgment issued in 2013 states the court deferred his proceedings and placed him on community supervision. RR-5 p. 158. Nonetheless, that 2013 judgment also states while on community supervision he violated that community supervision by committing a law offense against the state of Texas. RR-5 p. 159. The judgment does not describe the offense, but adjudicated his guilt and sentenced him to 8 months incarceration on January 9, 2013. RR-5 p. 158.

In 2013, Amanda began her own criminal history with a forgery offense. RR-5 p. 149. In connection with that, the Department received a referral because Amanda left John with an inappropriate caregiver when she was arrested. RR-5 p. 149. There is no indication the Department ever was required to take custody, because a community agency was willing to care for John until alternative arrangements could be made. RR-5 p. 149.

In 2014, not long after their second child was born, the Department received a referral alleging neglectful supervision by both Amanda and Daniel. RR-5 p. 149. The first report was that John suffered a black eye. RR-5 p. 140. The second report concerned a skull fracture that Angela suffered at just one month old. RR-5

2

p. 140. The physician statement stated that "the injury would have come from excessive force." RR-5 p. 149. The Department determined the mother's story of the injury was inconsistent with that statement. RR-5 p. 149. The case disposition was "reason to believe with removal." RR-5 p. 149. After the children came in care, the parents completed their services, the children were returned home February 26, 2016 and the Department's case was nonsuited on May 11, 2016. RR-5 p. 149; RR-2 p. 60.

From February to May the children were in the custody of their parents. RR-2 p. 60. However, on May 19, 2016, the Department of Family and Protective Services (DFPS) received another referral. RR-5 p. 148. This time, it was reported that John had a bruise on his chest and two parallel linear bruises about 6 cm in length on his hip/lower back and it was noted "he explained that his mother, [Angela], hit him." RR-5 p. 148. The examining physician stated the marks on John's left side were consistent with a belt mark. RR-5 p. 148; 128 ("bruising on [the] abdomen consistent with a belt/stick").

Medical records for the hospital reflect the hospital social worker spoke with both parents. RR-5 p. 128 and 139. Amanda said the daycare reported the bruises to CPS and a caseworker told the parents to take the children to the hospital for an exam. RR-5 p. 128. The notes added the mother described the bruises as not severe, and suggested the bruises occurred in connection with a birthday party the

3

prior weekend in Santa Fe, Texas where there were outside activities. RR-5 p. 128. Daniel also referred to the birthday party when asked about the bruising. RR-5 p. 139. He commented that he noticed a mark on John's chest the day after the party but did not notice bruising to John's back or hip area. RR-5 p. 139. Daniel denied that John had any other falls and denied using a belt to discipline John or Angela. RR-5 p. 139. The social worker's notes indicate John stated "I fell" but did not elaborate. RR-5 p. 139. The father acknowledged he spanked the children sometimes but denied hitting the children with a belt. RR-5 p. 139.

The social worker documented that while interviewing the parents, she observed the children playing aggressively and at one point the youngest child bumped into the older child causing a nose bleed. RR-5 p. 131. Notwithstanding, that rambunctious behavior, neither parent appeared to control or redirect the children and neither parent demonstrated strong parenting toward the children's behavior. RR-5 p. 131.

The CARE Team documented the following "social history" given to them by Daniel in their "Final Report":

> Lives with mother, father, 21 month old sister [Angela]. [John] and [Angela] were in foster care for 19 months; CPS was called on two occasions. The first report was made when [John] suffered a black eye while under the care of a babysitter while mother was giving birth to [Angela]. The second report was regarding a skull fracture when [Angela] was 1 month old. Father stated that [John] pulled [Angela] from the bed causing the fracture. Father states he had a domestic violence charge at age 16 or 17 regarding an altercation with his stepfather. He denies any other domestic violence history.

4

RR-5 p. 140.

In a document titled, "Final Report," and electronically signed by two doctors, it made the following assessment:

> The marks on [John] clearly resulted from a beating with a belt, but father denied this even when directly confronted with our assessment. … [John]'s bruises represent excessive physical punishment, and the abuse could escalate if not addressed intensively now.

RR-5 p. 141.

The Department filed suit and was granted emergency temporary conservatorship of John and Angela on May 24, 2016. Appendix Tab 1. On July 14, 2016, an adversary hearing order was signed that warned the parents that actions required of them in that order were necessary and failure to comply could result in restriction or termination of parental rights. Appendix, Tab 2. The first action referenced was the Service Plan that the order stated would be approved at the Status Hearing to define the rights and duties of the parents. *Id.*

On July 20, 2016, service plans were filed with the court for Amanda and Daniel. CR 45-59. Three primary goals of the plan were listed. Those goals required the parent to learn about their children's needs, including their age appropriate behaviors, apply realistic expectations for their age and developmental capabilities, learn and demonstrate reasonable discipline to meet the child's needs and demonstrate ability to change behaviors that resulted in abuse. CR 54.

Daniel's service plan then required several tasks. CR 54. The first task required the parents to participate in couple's therapy and demonstrate what they learned in therapy sessions with the caseworker. CR 54. The second task required Daniel to complete a psychosocial assessment and follow its recommendations CR 54. The third task required him to attend scheduled visits, court hearings, permanency conferences and meetings required by the Department or the court. CR 54. The fourth task required him to participate in parenting classes and provide the caseworker with a certificate upon completion. CR 55. The plan specifically provided that it was Daniel's responsibility to locate and pay for the fees for the parenting classes. CR 55. The plan also required Daniel to maintain appropriate housing and employment, and refrain from illegal activities. CR. 54-56. A final task required that he agree to fully comply with the Agency in an effort to reduce/eliminate the behaviors/actions that resulted in the removal of the children and added that would "include participating in all recommended services." CR 56.

On August 24, 2016, the court approved the family service plans and made them orders of the court. RR-5 p. 162, 164. The order specifically found Daniel "understands the service plan and has been advised that unless he is willing and able to provide the children with a safe environment, even with the assistance of a service plan, within the reasonable period of time specified in the plan, his parental and custodial duties and rights may be subject to restriction or to termination or the

6

children may not be returned to him." RR-5 p. 163. The order then stated:

> IT IS ORDERED that, except as specifically modified by this order or any subsequent order, the plans of service for [Daniel] filed with the court, and incorporated by reference as if the same were copied verbatim in this order, is APPROVED and made an ORDER of this Court.

RR-5 p. 164.

The court further required visits with the children to be conducted in a therapeutic setting with a qualified therapist and added with respect to the parenting classes that the parents be referred to parenting classes specifically tailored for children with special needs. RR-5 p. 164.

A subsequent permanency conference was held October 13, 2016, but Daniel did not attend or notify his caseworker he could not attend. RR-5 p. 145. He also was not present at the permanency hearing held November 16, 2016. RR-5 p. 170 (only attorney) and p. 145 (did not appear). The court documented in its order at that time that Daniel and Ashley had not demonstrated adequate compliance with the service plans. RR-5 p. 172. The order also ordered genetic counseling. RR-5 p. 174 and 145. A later note indicates Angela's neurologist had recommended the counseling because of chromosomal abnormalities discovered during a screening test. RR-5 p. 145. In this same order, the court also continued its previous orders without modification. RR-5 p. 174.

In October of 2016, David completed a psychological evaluation. RR-5 p.

That evaluation required a medical examination to determine possible treatment for ADHD, individual and couples counseling, as well as parenting classes. RR-5 p. 145. Daniel did not complete the medical consultation recommended. RR-5 p. 145.

Until February of 2017, David only attended one of the two scheduled parent-child visits each month and did not begin counseling until March 2017. RR-5 p. 145. The therapist observed that both of the children were fearful of Daniel for several months and at one visit in May 2017 they ran to the therapist appearing fearful when Daniel used a loud voice. RR-5 p. 145.

In May of 2017, this couple had another child. RR-5 p. 146. Once the baby was born, the therapist observed the mother seemed unsure what to do when the baby cried, which she found surprising considering it was her third child. RR-5 p. 145. She noted neither parent was good at managing all three children successfully and did not think they were able to meet their special needs. RR-5 p. 145.

In the meantime, Daniel did not proactively seek to find the special needs parenting classes required by his service plan until June 2017, which was almost a year after the service plan was ordered. RR-5 p. 145, 162, 164. The therapist said the kids did better at visits after June and noticed they did not exhibit fear toward the parents. RR-5 p. 145. Daniel went to individual and couples counseling but stopped working with the CPS funded therapist and began paying for his own

8

therapist until the court ordered this funded by the Department.  RR-5 p. 145.

In July of 2017, Angela completed a psychiatric evaluation that recommended random urine drug screen individual psychotherapy, depression medication with follow up, parenting classes and participation in an autism support group.  RR-5 p. 144.  She began working with a therapist, taking depression medication and parenting classes but did not receive drug testing or attend autism support group sessions. RR-5 p. 144.

On October 18, 2017, the Guardian ad Litem for the children filed a report with the court.  RR-5 p. 143.  The report recommended that the Department obtain PMC of the children, parental termination and that the children remain in their current placement.   RR-5 p. 149. The report detailed the basis of the recommendations, which included reference to the therapist's findings, the parents' lack of cooperation and the children's situation.

In that regard, the report made several comments about the lack of understanding the parents demonstrated concerning the children's special needs. RR-5 p. 146. The parents had not completed special needs parenting classes and had not been able to articulate an understanding of all the children's diagnoses. RR-5 p. 146. It noted when the children came back in care, it was apparent the parents did not adequately meet the children's needs.  RR-2 p. 146.  For example, while Texas Children's Hospital gave numerous reminder calls to the mother about

a follow up MRI for Angela due to a hospitalization in March 2016, the calls were never returned and the MRI was not done until the children came back into foster care.  RR-5 p. 146.  It was further noted that when John came back in care, he would not engage with people as he had before and was frantic upon waking if he had wet the bed as he was very afraid of being disciplined. RR-5 p. 146.

The report noted both children were in a foster/adopt family selected from a process in June of 2017.  RR-5 p. 146.  While that just recently occurred, the report noted the children were well acquainted with this foster family, because they lived in the same community as their former foster family.  RR-5 p. 146.  It added the children lived with the former foster family from September 2014 until February 2016 in the first case and then from May 2016 to June 2017 in this second case.  RR-5 p. 147.  The report noted the children were in a loving, consistent and stable environment and the new foster family was very dedicated to securing the children's special services, medical appointments and therapies for their special needs. RR-5 p. 147.

The report added that the younger child, Angela, had a neurological disorder, paroxysmal tonic upgate (PTU), which causes her to look out of the tops of her eyes, walk wobbly and unsteady. RR-5 p. 147.  The neurologist stated the condition is rare but she should outgrow it.  RR-5 p. 147.  A neuro-ophthalmologist also diagnosed this child with vision loss in the lower left quadrant of both eyes.

RR-5 p. 147. The doctor attributed this vision loss to optic nerve damage from the skull fracture that brought her in care in the previous case. RR-5 p. 147.

Angela also suffered from a febrile seizure disorder and was under the care of a neurological team at Texas Children's Hospital. RR-5 p. 147. By the time of this report, it was noted she had not experienced seizures for several months. RR-5 p. 147. A Chromosomal Micro Array done in April 2016 at Texas Children's Hospital showed she had abnormalities on two chromosomes that would require further monitoring and evaluation but as of August 2017 she was progressing normally. RR-5 p. 147.

Angela began attending a Pre-K program in August 2017 with vision and orientation and mobility services. RR-5 p. 147. She was specially fitted with a soft helmet to protect her when she stumbles due to her diminished vision and has a special cane with a wheel to help her negotiate the ground. RR-5 p. 147. It was noted she needed constant monitoring for her safety because her incidents of falling increased. RR-5 p. 157.

John was diagnosed with Autism Spectrum disorder, Attention Deficit Hyperactivity Disorder and Disruptive Mood Dysregulation Disorder in which a child is chronically irritable and has severe explosive outbursts grossly out of proportion to the situation. RR-5 p. 148. Jacob also had a chromosomal disorder responsible for global development delay as well as behavior disruption. RR-5 p.

11

He also struggles with speech and articulation and his motor skills are delayed.

John is enrolled in a kindergarten program in which he qualified for PPCD due to his ADHD and speech impairment. RR-5 p. 147. He receives speech therapy at school as well as weekly sessions at home. RR-5 p. 147. He also receives occupational therapy twice a week at home. RR-5 p. 147. His foster parents also give him daily tutoring with his academics as well as working with him on fine motor skills and muscle development. RR-5 p. 145. He takes ADHD medication to help manage aggression and hyperactivity and Ritalin in addition to the gunfacine to help with focus and impulsivity. RR-5 p. 148. He also takes, as needed, Hydroxyzine, to calm down when he has an explosive meltdown. RR-5 p. 148. The neurologist made a referral to Texas Children's Meyer's Clinic for behavioral therapy and he had his first appointment in May of 2017. RR-5 p. 148. He since received medical orders for therapy to address behavior and social interaction as well as orders for speech and occupational therapy. RR-5 p. 148. The foster family was on a 6-month waiting list for in-home therapy which was the only option given his current school and other in-home therapy. RR-5 p. 148.

The report went on to note that the parents secured housing together. RR-5 pp. 144 and 145. Amanda was employed with Goodwill and Daniel had part time employment with Metco and a hunting guide business. *Id.*

Trial was held November 17, 2017. RR-2. The Department's first witness was Dr. Rebecca Girardet. RR-2 p. 20. Dr. Girardet is board certified in child abuse pediatrics and the director of the CARE Team at Memorial Hermann Children's Hospital. RR-2 p. 20. She testified that she had treated John during his hospitalization in May 2016. RR-2 p. 21.

She noted that John had a past medical history of ADHD, disruptive behavior syndrome, and febrile seizures. RR-2 p. 22. She testified that John presented to the hospital with "a mark on his left hip that was two parallel lines that was consistent with a belt mark." RR-2 p. 23. She further testified that Daniel denied the mark resulted from a belt. RR-2 p. 24. He indicated the cause was from falling from a boucy house onto grass several times. RR-2. P. 24. However, she noted the pattern was clearly a belt mark. RR-2 p. 24. She stated the mark was not consistent with an accidental fall. RR-2 p. 26. She stated the explanation given was not consistent with the injury. RR-2 p. 26.

Dr. Giradet was asked by Daniel's attorney if the mark could have occurred by John falling on a bouncy house strap. RR-2 p. 37. She testified that the child would not have been able to hit the strap with enough force to leave the mark that she observed. RR-2 p. 37. She added: "He was struck." RR-2 p. 37.

The next witness, Susan Imre, stated she had been the children's advocate since May 2015 during the first Department case involving these children. RR-2 p.

13

50. She acknowledged Child Advocates was opposed to returning the children during that first case. RR-2 p. 67.

She confirmed Daniel called her on May 20, 2016 to tell her about the referral for this second case. RR-2 p. 41. In that conversation, Daniel denied hitting John with a belt but commented he used the snapping of a belt to get John's attention. RR-2 p. 41-42.

Susan was asked to talk about her report on behalf of Child Advocates. RR-2 p. 43. She confirmed it was recommending parental termination and considered the fact that the children had special needs which neither parent had total grasp. RR-2 p. 43.

In that connection, Susan spoke about the children's special needs. She noted that John had problems with autism and ADHD. RR-2 p. 44. She noted he was enrolled in a school program for children with special needs. RR-2 p. 45. She stated he received speech and occupational therapy and was specially monitored for his behavior problems. RR-2 p. 45. Susan noted he was behind in school, but making progress and showing a lot of development. RR-2 p. 45. She added she met with the child and found him very focused and it was hard to divert his attention once he focused on doing something. RR-2 p. 46. She stated he could be loving but could also be rough and very impulsive. RR-2 p. 46.

Concerning Angela, she acknowledged she was 3 years old at the time of

this trial. RR-2 p. 48. She noted that when this child came back in care she had a noticeable neurological issue in which she was wobbly and looked out of the tops of her eyes. RR-2 p. 49. Nonetheless, the child had not been seen for that condition. RR-2 p. 49. When she asked the dad about that, he just commented that was part of her seizure thing. RR-2 p. 49. She noted the child also had a skull fracture in the first case that caused loss of vision from nerve damage. RR-2 p. 52. She commented the father was not aware that was permanent. RR-2 p. 52.

In discussing Child Advocate's recommendation of parental termination, she commented that Child Advocates had concerns about medical and physical neglect. RR-2 p. 53. She noted there were two cases where the explanation was not consistent with the medical injury. RR-2 p. 53. Also, there was concern about the mother's ability to care for not only two special needs children as well as an infant. RR-2 p. 53. She added "I realize that's a separate case, but [John] is a very challenging child and needs constant monitoring." RR-2 p. 53. She added, that Angela has vision loss and PTU that needed monitoring and neither child could be left together alone. RR-2 p. 53.

She added that Angela was hospitalized for febrile seizures in March of 2016, and when the parents were questioned about why the child did not make an appointment for a follow up MRI, the mother said she did not need it. RR-2 p. 54. Also, though the dad said it would be done right away, but it was not. RR-2 p. 54.

15

She further commented that the father was away a lot and the bulk of child care, including medical appointments, fell to the mother.  RR-2 p. 55.   She stated she observed an inability of the mother to grasp the magnitude of the severity of her children's condition and their needs. RR-2 p. 57.   She also commented that during a previous court hearing, Amanda laughed inappropriately while she testified about the children's needs. RR-2 p. 57-58. She noted it was disturbing to her that she laughed during testimony about all the special needs of her children. RR-2 p. 58.

She added the children's needs were currently met, they were thriving and doing extremely well. RR-2 p. 56.  She stated if you compare the way the children were when the children first came in to care, the difference was night and day. RR-2 p. 56. She stated the caregivers show the children great attention to their special needs and take them to all their required therapy and doctor appointments. RR-2 p. 56.  She stated the foster parents are very patient with these children, give them lots of love and support and continue to make the children healthier.  RR-1 p. 57.

Susan confirmed the children had been in two different foster placements. RR-2 p. 62-63.  She noted they were taken from the first placement because they did not want to adopt and in this case, the goal had been unrelated adoption from day one. RR-2 p. 63.  She stated after the legal risk broadcast in June 2016, the children were moved to a family selected in June of that year.  RR-2 p. 63.

Susan stated the family visits were occurring every two weeks at a play therapist office in Kingwood. RR-2 p. 64. She added that therapeutic visits were requested because when the children first came back in care, they had negative reactions seeing the parents, and, particularly to the father. RR-2 p. 65. When asked to describe the negative behaviors, she noted when they indicted they were going to see their parents, John was saying, "No, No." RR-2 p. 65. She added that Angelica would cling to her foster mom and not want to see the parents, but with the play therapist they calmed down and she witnessed the children playing happily with dad there and no overt fear being shown. RR-2 p. 65.

Susan noted when the children first came in care, John was 2 and Angela was only about 4 weeks old. RR-2 p. 65-66. She said Angela was 2 when she first came back in care this time. RR-2 p. 70. Taking away the two or three months of monitoring, she commented that Angela had been with her foster parents her entire life. RR-2 p. 66. Susan added there was significant bonding between the children and their foster parents. RR-2 p. 66.

The Department's caseworker, Lakeela Caraway testified next. RR-2 p. 77. She confirmed the Department shared all of the same concerns testified to by the child advocate. RR-2 p. 82. She further testified that even after working with the family for the last three years, the parents are not able to provide a safe and stable environment for their children. RR-2 p. 83.

Lakeela acknowledged the parents went to couples and individual therapy, did a psychological assessment, and had been visiting. RR-2 p. 87. She also acknowledged they attended special needs parenting classes. RR-2 p. 87. She added the parents' home was appropriate and the father was working full-time. RR-2 p. 88.

Daniel testified next. RR-2 p. 90. Daniel acknowledged he was the same Daniel who was convicted of failing to comply with sex offender registry requirements in 2012 and again in 2013 as evidence by Petitioner's exhibits 4 and 5 (RR-5 p. 154-158). RR-2 p. 90.

Daniel claimed he never hit John nor had he ever seen Amanda hit John with a belt. RR-2 p. 90. He also stated he had no concerns with leaving any of his children alone with Amanda. RR-2 p. 92. He stated neither of them caused the skull fracture to Angela. RR-2 p. 92. He added it was not by physical force by him or his wife and he was never questioned by law enforcement. RR-2 p. 92. He stated she was hurt when she was pulled off the bed by her 3 year old brother. RR-2 p. 92. He stated the bed was two feet off the ground. RR-2 p. 93.

When asked about the belt mark, he maintained that occurred at a bouncy house. RR-2 p. 94. Daniel stated he saw the mark on John and stated it was the same shape and size as the strap of the bouncy house. RR-2. p. 102.

When asked about the genetic testing, Daniel confirmed he did not go. RR-2

p. 94. He acknowledged he was informed his children suffer from genetic abnormalities. RR-2 p. 95.

Daniel stated he is home by 3:00 and has a support system of family and friends. RR-2 p. 103. He stated he received enough from his job to care for the children's financial needs. RR-2 p. 103.

Daniel stated they were aware of John's ADHD but did not know of his other special needs until he was back in custody. RR-2 p. 105. He stated he completed special needs parenting. RR-2 p. 105. He stated with completing the family service plan, they were better parents. RR-2 p. 106. He stated they also started therapy with the therapist in the courtroom. RR-2 p. 106. He believed the therapy assisted them to be mother and father to their children educationally and dealing with situations between their relationship. RR-2 p. 106.

Daniel stated that the main things he learned through the special needs parenting classes were about immunizations and respite to deal with the children. RR-2 p. 108. Through these classes, he believed he and Amanda became better able to parent their children's special needs. RR-2 p. 108. However, when asked if he knew their special needs, he acknowledged he did not know the specifics of their needs. RR-2 p. 110.

Amanda testified next. When asked how Angela got a skull fracture, she stated her brother pulled her off the bed. RR-2 p. 111. She acknowledged the

medical providers at the hospital disagreed with that explanation. RR-2 p. 111. She stated she never struck John with a belt leaving a mark. RR-2 p. 112. When asked if she witnessed John run into a cable or line or hit a buckle or something to cause a mark on the bouncy house, she stated she did not. RR-2 p. 112.

Amanda admitted that the child advocate had contacted her and Daniel on multiple occasions to have genetic counseling set up to comply with the court order. RR-2 p. 113. She also acknowledged there were multiple occasions with Judge Ellis where she was told she needed to get the genetic counseling set up and Daniel was with her during those conversations. RR-2 p. 113.

Amanda stated she had concern about her children's genetic abnormalities. RR-2 p. 113. When asked what she did to address that, she stated she researched on the internet about potential causes of the genetic abnormalities but had not set up an appointment with a professional. RR-2 p. 114. She added she had never contacted the children's physicians or reviewed the children's medical records. RR-3 p. 113. She confirmed she had not done that in the last three years and did not contact their therapists or specialists. RR-2 p. 115.

Amanda claimed she asked CPS for the physician's name at some point and said she asked "five, four or three" times. RR-2 p. 115-16. She claimed she made the requests over the phone adding "I can't get ahold of her." RR-2 p. 116. Amanda acknowledged she had to do genetic testing and counseling. RR-2 p. 116-

17. She claimed CPS never provided her with the contact information for genetic testing and genetic counseling. RR-2 p. 117. She claimed she contacted the hospital regarding genetic testing. RR-2 p. 117.

When asked if she was married to Daniel, Amanda stated that they were common law adding: "it's complicated. RR-2 p. 117-18. Amanda stated they started out paying for their therapy and CPS was ordered to pay for the therapy. RR-2 p. 119. She added they were not reimbursed and paid for about three months. RR-2 p. 120.

The Foster Mother of the children testified next. She stated her plan was to adopt the children if parental rights were terminated. RR-2 p. 123. She stated in order to get up to speed on the children's special needs, she attended all of the meetings with the school board where they go over the child's special needs for school and the services they would receive. RR-2 p. 123. She added she takes John to appointments with his psychiatrist, genetics appointments and neurologist appointments. RR-2 p. 123. She stated they work with Angela's visions needs and monitor her at home to make sure she's safe and learning her environment well. RR-2 p. 123.

The Foster Mother stated they were comfortable addressing the special needs of the children and acknowledged they had several and they changed over time. RR-2 p. 124. She stated they were willing to keep the children in their home,

to love them and continue to help them as they grow up. RR-2 p. 125.

The Foster Mother, confirmed she was the one who set up the appointments with doctors, meetings and anything like that. RR-2 p. 125. She noted he continued doctor visits from the previous foster placement. RR-2 p. 125.

The Foster Mother stated even if the parental rights were not terminated they would be willing to continue care for the children if their medical needs were covered through CPS. RR-2 p. 125-26. She also confirmed they would be willing to keep the children in their home until they aged out of the system. RR-2 p. 126. She stated they care about all three of the children. RR-2 p. 126.

The following witness was Michele Criddle. She stated she was a marriage and family therapist and met Amanda and Daniel after Amanda called her. RR-2 p. 127. She stated she worked with the parents since June 26, 2017. RR-2 p. 127 and 141. She stated she provided them couples therapy as well as individual therapy for them. RR-2 p. 128. She met with them every other week for individual sessions and couple sessions every other week, including crisis intervention. RR-2 p. 128. She commented that crisis intervention was when emotions are escalated or emotional distress occurs where they feel they need additional therapeutic support. RR-2 p. 128. She stated they attended regularly since June. RR-2 p. 128-29.

She stated her goals in couples therapy was to teach Davis and Amanda to emotionally regulate and work on their communication as well as learn what their

parenting goals should be. RR-2 p. 129. She believed they progressed. RR-2 p. 129. Specifically, she commented that she worked with the parents to redevelop parenting abilities that are deficient and anger management. RR-2 p. 130. Ms. Criddle indicated the parents progressed with therapy. RR-2 p. 131.

Ms. Criddle acknowledged she had not met the children nor had she reviewed any of the children's medical records regarding their past injuries that brought them into care. RR-2 p. 132-133. She further acknowledged she could not render an opinion on whether the parents were fit to have the children returned home to them. RR-2 p. 133. She added that was why she requested to have therapy with the children and parents together. RR-2 p. 133.

Nonetheless, Ms. Criddle stated she disagreed with the Child Advocates' opinion and stated she believed Amanda had "capacity" and "ability" adding "we have to guide her .. educate her about what that is." RR-2 p. 137. She added her past experiences with her parental upbringing did not give her guidelines that she needed to be the parent she needed to be. RR-2 p. 137. She added Amanda was very willing and Ms. Criddle commented she was very pleased with the way that they parent. RR-2 p. 127. She further added she believed the parents had the love and intention and capacity but they needed "additional resources to do so" and she was advocating for that. RR-2 p. 138.

When Ms. Criddle was asked if she believed the relationship between

23

Amanda and Daniel was stable, she stated it was "stable." RR-2 p. 139. She admitted, however, that approximately two weeks before trial Amanda took $500 out of the bank and left a note for David stating their relationship was over. RR-2 p. 140.

Ms. Criddle stated she believed the parents' explanation of Angela's skull fracture injuries. RR-2 p. 140. She also believed their explanation about the belt marks to his body. RR-2 p. 140. Ms. Criddle confirmed she was a marriage and family therapist and commented she did not need to have a medical degree or experience with trauma or physical injuries to the body. RR-2 p. 140-41.

## SUMMARY OF ARGUMENT

The Appellant's Brief requests reversal of the parental termination judgment against Daniel based on insufficiency of the evidence. Namely, the brief claims there was insufficient proof to establish he endangered his children, placed them in dangerous circumstances or failed to comply with a court order for reunification and that termination of his parental rights was in their best interest. However, the record in this case provides more than sufficient proof.

First, the record shows Daniel committed dangerous behaviors and placed the children in dangerous conditions for the findings under D and E. The record is undisputed he was the subject of crimes of domestic violence and sexual abuse before his oldest child was born and, after his oldest was born, he failed to comply

24

with the requirement that he register as a sex offender and ultimately got an 8 months sentence while his oldest child was very young. In addition, while under Daniel's parentage, the oldest child suffered a black eye in 2014 and belt marks and bruising in 2016 that a doctor determined resulted from excessive punishment. The youngest child also suffered a fractured skull at one month of age that was found to have resulted from excessive force. In all of these incidents, it was found the parents' excuses for the children's injuries were inconsistent with medical determinations.

The appellant's brief argues there was not sufficient proof to disbelieve the parents' excuses because they were consistent in their claims. Nevertheless, a trier of fact was not required to believe them, especially considering it was observed during this second case that the children were afraid of Daniel. There also was evidence that the parents were not properly responding to the children's special medical needs and remained ignorant of them. Considering the children's special needs were great and required monitoring, this was a fact that established the parents jeopardized the well-being of their children for both D and E.

As for the finding under Subsection O, the evidence is conclusive. The court ordered Daniel to comply with the Department's service plan after these children came into care upon learning that John suffered bruises and a belt mark that a doctor concluded showed excessive punishment. Daniel failed to comply

with requirements at the beginning of the case by failing to go to a court hearing, permanency conference and some visits and then delayed one of the most important tasks involving parenting classes for almost a year. Also, he did not show by the time of trial that he learned what was necessary under the goals of the plan, which included a showing of a safe environment.

The Appellant's Brief argues there was no order for purposes of Subsection O, but that is not what the record shows. In particular, the brief argues that the ordered service plan could not be considered ordered because it was not put in evidence as an exhibit. However, this was a bench trial, and this court has held this court presumes the court takes judicial notice of its own records in a case. The family service plan was part of the trial court's record in this case, therefore, it may be presumed the trial court considered it.

The appellant's brief also refers to language in a permanency hearing order that orders a service plan attached to the order and argues that means the service plan was never ordered because it was not attached. However, that disregards that the service plan was already ordered in an earlier order (the Status Hearing Order) and the court ordered it by referring to the service plan filed with the court. Nothing in the later permanency order vacated the order of that service plan. Consequently, this claim should be rejected.

The last challenge in the Appellant's Brief challenges the sufficiency of the evidence for the finding that termination was in the children's best interest. The court had sufficient basis for terminating Daniel's parental rights considering the same evidence that supported the court's findings under D, E and O. Moreover, the undisputed proof that Daniel did not know his children's special needs by the time of trial when these children had many special needs that required medical visits and monitoring weighed heavily in favor of the court's finding. That is especially true considering these children have lived in foster care for most of their lives in the last three years, have a very significant bond with the foster parents, the foster parents have been addressed their special medical needs and want to adopt them. In light of this evidence, the evidence was more than sufficient to support the court's finding that parental termination was in the children's best interest. The judgment should, therefore, be affirmed.

**ARGUMENT AND AUTHORITIES**

**REPLY POINT: The evidence sufficiently supported the court's findings for termination of the father's parental rights**

**1) Applicable Law and Standard of Review**

The court's decree confirms that Daniel's parental right were terminated under Section 161.001 of the Family Code upon clear and convincing proof that (1) he committed acts under Subsection (b)(1)(D), and (E) per section 161.001(1) of the Family Code; and (2) that termination was in the best interest of the child.

CR 134-35; Tex. Fam. Code § 161.001(b)(1), (2); *In re J.O.A.,* 283 S.W.3d 336, 344 (Tex.2009). Notably, the involuntary termination of parental rights is a serious matter, because it implicates fundamental constitutional rights. *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985); *In re D.R.A.,* 374 S.W.3d 528, 531 (Tex.App.—Houston [14th Dist.] 2012, no pet.). However, while of constitutional magnitude, parental rights are not absolute. *In re C.H.,* 89 S.W.3d 17, 26 (Tex.2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

To address the serious interests in the permanent and severe decision of parental termination, Section 161.001 of the Family Code imposes a burden of proof that is heightened under the clear and convincing evidence standard. *See* Tex. Fam. Code § 161.001(b) (West Supp. 2016); *In re J.F.C.,* 96 S.W.3d 256, 265–66 (Tex.2002). In this connection, the Family Code defines "Clear and convincing evidence" as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *accord In re J.F.C.,* 96 S.W.3d at 264.

The heightened burden of proof at trial also results in a heightened standard of review. *In re C.M.C.,* 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.]

2008, no pet.). In reviewing a legal sufficiency challenge, an appellate court considers all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.,* 283 S.W.3d at 344; *In re J.F.C.,* 96 S.W.3d at 266. It is also assumed in that analysis that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and an appellate court will disregard all evidence that a reasonable fact finder could have disbelieved. *In re J.O.A.,* 283 S.W.3d at 344; *In re J.F.C.,* 96 S.W.3d at 266.

Appellate review of the factual sufficiency of the proof considers and weighs all of the evidence, including disputed or conflicting evidence. *In re J.O.A.,* 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* Importantly, in such review, the appellate court acknowledges the fact finder is the sole arbiter of the credibility and demeanor of witnesses and, as such, will give due deference to the fact finder's findings and not substitute its own judgment for that of the fact finder. *In re H.R.M.,* 209 S.W.3d 105, 108 (Tex.2006).

2) **Father's pattern of criminal behaviors, abuse of the children under his care and neglect supported the court's findings under Subsections D and E of Section 161.001(b)(1) of the Family Code.**

29

The findings under D and E involve parental conduct stated as follows:

(D)    knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

(E)    engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

Tex. Fam. Code Ann. §161.001(b)(1)(D), (E) (West Supp. 2016).

The term "endanger," used in these sections includes the commonly understood meaning: i.e. exposing a child to loss or injury or jeopardizing a child's emotional or physical health. *Texas Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987). As clarified by the Supreme Court, the proof for endangerment does not have to be established as an independent proposition, but can be inferred from parental misconduct alone. *Boyd,* 727 S.W.2d at p. 533. Also, it is not necessary that the parental misconduct be directed at the child, occur in the child's presence or that the child actually suffer injury from it; and it may include evidence of conduct before the child's birth as well as before and after the child has been removed by the Department. *See In re B.B.,* 971 S.W.2d 160, 166-69 (Tex. App.—Beaumont 1998, pet. denied).

Based on these standards, there was more than sufficient evidence showing Daniel engaged in conduct endangering to his children and placed them in dangerous surroundings. Such evidence included the following:

1. **Parents engaged in behaviors that subjected the parents to incarceration after the children were born.** RR-3 p. 140 ("Father states that he had a domestic violence charge at age 16 or 17 regarding an altercation with his stepfather"); RR-3 p. 149 (3/24/2003 – sexual assault felony; 4/25/2011 failure to register-convicted; 5/23/2012-failure to register-convicted; 6/21/2012-failure to comply with registration-state jail felony-convicted); RR-5 p. 155 (September 2012 sentenced 2 years for failure to register); RR-5 p. 158 (January 2013 sentenced 8 months based on adjudication of prior deferred offense for failure to register, because violated law); RR-5 p. 149 (2013 mom gets forgery offense).

2. **Children experienced injuries from excessive force under the parents' care on separate occasions and each time parents' excuses were inconsistent with medical assessment** RR-5 p. 149 (2014 John suffered black eye, Angela had skull fracture and physician statement provides "the injury would have come from excessive force,"and Department determined mom's story inconsistent with physician statement); RR-5 p. 148 (2016 reported John had bruise on chest and two parallel linear bruises on his hip/lower back and "he explained that his mother, [Angela], hit him."); RR-5 p. 141 (doctors concluded marks on John clearly resulted from beating with belt, though father denied, and they concluded bruises represented excessive physical punishment); RR-2 p. 37 (Dr. Giradet confirmed marks could not have come from a belt strap in a bouncy house and stated, "He was struck."); RR-2 p. 53 (advocate explained basis of her recommendation included fact that these parents were subject of two cases where the explanation was not consistent with the medical injury).

3. **Pattern of neglectful parenting by parents, especially in light of children's special needs.** RR-5 p. 155-56 (Daniel convicted twice after John born for failing to register and was sentenced to 8 months jail on January 9, 2013, which, of course, made him unavailable for this child's care); RR-5 p. 149 (2013 Amanda left John with an inappropriate caregiver when arrested and arrangements had to be made with an outside resource); RR-5 p. 131 (social worker observed despite aggressive playing by children resulting in one child causing other child's nose to bleed, parents did not appear to control or redirect the children and social worker determined neither parent demonstrated strong parenting toward the children's behavior); RR-5 p. 145 (therapist observed mother unsure what to do when her newborn baby cried, and found neither parent was good at managing all three children successfully and did not think they were able to meet their

special needs); RR-5 p. 146 (when children back in their care after first case, apparent parents did not adequately meet the children's needs and noted mother did not take Angela for follow up MRI after March 2016 hospitalization despite numerous reminder calls by Texas Children's Hospital); RR-2 p. 54 (commenting on parents' failure to follow up after March 2016 hospitalization, Advocate noted mother insisted child did not need it and though father said it would be done right away, it was not done); RR-2 p. 49 and 52 (advocate observed Angela had noticeable neurological issue in which she was wobbly and looked out of the tops of her eyes, had not been seen for condition, dad just commented it was part of her seizure thing; and father was unaware this child's vision loss from skull fracture was permanent); RR-2 p. 55, 57-58 (Advocate noted father away a lot and left responsibilities to mother whom Advocate noted was unable to grasp magnitude of children's condition and laughed inappropriately when she spoke in court about the children's many special needs).

These facts together established a firm basis for the trier of fact to conclude the parents exposed their children to loss or injury and jeopardized their emotional or physical health to support the court's finding of endangering conduct and circumstances. *See Boyd,* 727 S.W.2d at 533.

As indicated above, the parents' endangering behavior began with intentional criminal behaviors by both parents that placed their children in a situation that jeopardized their well-being. *In re V.V.*, 349 S.W.3d 548, 555 (Tex. App. – Houston [1st Dist.] 2010, pet. denied) ("Intentional criminal activity that exposes a parent to incarceration is conduct that endangers the physical and emotional well-being of a child."). Such intentional criminal activity jeopardized the stability and safety of these children especially considering these children were very young when these behaviors occurred as well as the fact that both parents

engaged in behaviors that resulted in incarcerations. Moreover, with respect to Daniel particularly, his pattern of his criminal behaviors raised concern about his potential for violence, because he previously was involved in a domestic violence incident when 16 or 17, a felony sexual assault crime at some point thereafter, and then violated sex registration requirements several times and ultimately went to jail under an eight months sentence while his first child was very young. RR-5 pp. 149, 155-56, 158, 159; RR-3 p. 140.

Of course, the most concerning endangering conduct listed above concerns the injuries these children suffered on separate occasions documented to include a black eye, a fractured skull from excessive force and belt marks from excessive punishment. RR-5 p. 149 and 141; *Jordan v. Dossey*, 325 S.W3d 700, 724 (Tex. App. – Houston [1st Dist.] 2010, pet. denied) (abusive and violent criminal conduct by a parent can produce an environment that endangers a child). The father's brief claims the father testified he did not harm his children, always gave consistent reasonable explanations and mainly left the children with the mother. However, the trier of fact did not have to believe the father's claims especially in light of medical findings documented that showed these injuries were the result of excessive force or punishment and the doctor at trial rejected Daniel's excuse of play or falling on a belt in a bouncy house. RR-5 p. 145, 141; RR-2 p. 37; *See In re J.P.B.,* 180 S.W.3d 570, 574 (Tex. 2005) (acknowledging it was within the

province of trier of fact to judge father's demeanor and decide to disbelieve his testimony that he did not know how the child was injured); *See also In re H.R.M.*, 209 S.W.3d 105, 108-09 (Tex. 2006) (holding appellate court could not supplant trier of fact's conclusion to disbelieve parent's claim that he would be paroled).

Moreover, the final issue of dangerous behaviors involved Daniel's neglect of the children, especially in connection with their special medical needs. *In re H.M.O.L.*, No. 01-17-00775-CV, 2018 WL 1659981 *13 (Tex. App. – Houston [1st Dist.] 2018, pet. denied) (parent's failure to provide appropriate medical care may constitute endangering conduct for purposes of Subsection E). Based on observations of the social worker in the hospital, therapist, and Child Advocate it was concluded these parents demonstrated inappropriate parenting in response to these children's medical and personal needs. Such observations supported a finding the Daniel engaged in behavior endangering to his children. *See Vasquez v. Tex. Dept. of Prot. & Reg. Servs.*, 190 S.W.3d 189, 196 (Tex. App. – Houston [1st Dist.] 2005, pet. denied) (finding caseworker's observations of incidents indicating appellant's negligent in supervision could be considered as part of dangerous course of conduct).

In sum, considering all of these facts together shows a pattern of parental behaviors that exposed these children to unsafe surroundings and uncertainty and instability that endangers a child's physical and emotional well-being. *In re*

*M.M.M.*, Nos. 01-17-00980-CV, 2018 WL 1954178 \*10 (Tex. App. – Houston [1st Dist.] 2018, no pet. h.) (citing *In re R.W., 129 S.W.3d at 739).* There was not any disputed evidence of such significance as to outweigh this proof, consequently, there was legally and factually sufficient proof for the court's findings of D and E.

### 3) The evidence sufficiently supported the court's finding under Subsection O of Section 161.001(b)(1) of the Family Code.

Only one predicate finding under Section 161.001(b)(1); therefore, consideration of the evidence under Subsection O is unnecessary. *See In re A.V.*, 113 S.W.3d 362 (Tex. 2003). Nonetheless, the evidence is sufficient under that subsection as well. Under Subsection O, a court may terminate the parent-child relationship if the court finds, by clear and convincing evidence, that the parent

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

TEX. FAM. CODE § 161.001(1)(O) (West 2014); *In re E.C.R.*, 402 S.W.3d 239, 243 (Tex. 2013).

The evidence in this case supported that finding with the following evidence:

1. <u>Temporary orders placed children in Department's care for more than a year from May 2016 to November 2017</u>. Appendix, Tab 1 and 2; RR-2 p. 1.

2. Children came in Department's conservatorship by order under Chapter 262 for abuse or neglect. CR-5 pp. 18-23 (facts of abuse or neglect described in affidavit for emergency order); Appendix Tab 1 (emergency order appoints Department temporary managing conservator; Appendix, Tab 2 (orders recites court's findings under chapter 262 for abuse or neglect for appointment of Department as conservator); RR-5 p. 148 (Child Advocate notes Department named temporary managing conservator of the children on May 24, 2016 after referral of physical abuse on report of bruises on child, child said mother hit him, and examining physician said mark consistent with belt mark and inconsistent with family's explanation); RR-5 p. 141 (doctor statement said the marks reflected excessive punishment); RR-5 p. 173 (November 2016 court found neither parent willing and able to provide child with safe environment, therefore, return was not in the children's best interest).

3. Parents ordered to do service plan and warned that failure to comply with service plan could result in parental termination Appendix, Tab 2 (order, signed July 14, 2016, warned failure to comply with the service plan approved at status hearing could result in parental termination); CR 45-59 (Parents' service plans filed July 20, 2016); RR-5 p. 164 (Status Hearing Order, signed August 24, 2016, approved parents' service plans filed with the Court and incorporated it by reference as if copied verbatim in the court's order); RR-5 p. 163 (Order specifically found parents reviewed and understood their services plans and were advised unless they were willing and able to provide the children with a safe environment, even with the assistance of a service plan, within reasonable time specified in plan, parental rights may be subject to termination). RR-5 p. 163; RR-5 p. 164 (Order amended the service plan to require the parents to be referred to parenting classes and anger management specifically tailored for children with special needs). RR-5 p. 174 (Order of November 2016 orders: "The actions specified in each service plan … on file as of the date of this order represent actions which this Court requires of the Parent specified in the service plan .. and the actions much be performed in order for the parent to regain custody of the children who are presently in the temporary managing conservatorship of the Department.").

4. Daniel's service plan, ordered August 24, 2016, required Daniel to attend and participate in scheduled visitation, court hearings, and permanency conferences. CR 55; RR-5 p. 162, 164.

5. Daniel did not attend all scheduled visits, court hearings, and permanency conferences. RR-5 p. 145 (did not go to permanency conference in October 2016 and did not tell caseworker could not); RR-5 p. 145 (Daniel did not go to court hearing November 16, 2016; RR-5 p. 172 (November 16, 2016 Court found parents had not demonstrated adequate compliance with the plan); RR-5 p. 145 (Until February of 2017, David only attended one of the two scheduled parent-child visits each month); RR-5 p. 146 (parents cancelled visits on several occasions for non-emergency reasons).

6. Daniel's service plan, ordered August 24, 2016, required Daniel to locate, pay for and attend parenting classes and the court's order that ordered this service plan added that the parents should be referred to classes specifically tailored for children with special needs. CR 55 and 57; RR-5 p. 164.

7. Daniel did not even attempt to locate parenting classes tailored for children's special needs until June of 2017, almost a year after this task was ordered. RR-5 p. 145. The parents still had not completed this task by the time the Child Advocate reported in October 2017. RR-5 p. 146. Daniel reported he completed the task by the time of trial in November 2017. RR-2 p. 105.

8. The service plan had specific goals requiring Daniel to "learn and apply realistic expectations for the age and developmental capabilities of the child" and "demonstrate an ability to change the pattern of behaving that resulted in abuse." CR 54.

9. Nonetheless, Daniel did not demonstrate he learned realistic expectations for the children's developmental capacities or his ability to change the pattern of behaving that resulted in abuse. RR-2 p. 108 (when asked what he learned in parenting classes, Daniel stated he mainly learned about immunizations and respite); RR-2 p. 92 amd 55 (Daniel stated he had no concerns with leaving any of his children alone with Amanda and Child Advocate noted father was away a lot and left bulk of child care to father); RR-2 p. 55 (nonetheless, Child

37

Advocate stated mother was unable to grasp magnitude of her children's conditions and even laughed when the advocate detailed all the special needs of her children during a hearing).

As indicated above, there was proof that Daniel violated the service plan by failing to attend visits, court hearings, and a permanency hearing, delaying on performing his parenting classes until approximately a year into this case and failing to demonstrate realistic expectations considering his children's developmental capabilities, indicating the pattern of abuse from the past was not addressed.

While it is acknowledged Daniel stated he completed his service plan, and the testimony indicates he completed tasks required in his service plan by the time of trial, substantial or partial compliance with a court ordered service plan does not avoid a finding under Subsection O. *In re J.M.T.,* 519 S.W.3d 258, 267 (Tex. App. – Houston [1st Dist.] 2017, pet. denied). As noted by this court, Texas courts take a strict approach to O and even one failure of a service plan will support an O finding. *Id.*

Moreover, it is important to consider in this case that this was not Daniel's first time to be required to do a service plan, because they finished a service plan in a prior case and got their children returned. Consequently, it cannot be said he did not understand the importance of completing a court ordered plan in this type case. Further, he violated the court's order in a material way by delaying attending parenting classes on special needs for such a long time (approximately a year) and

failing to demonstrate learned behaviors because he was fine leaving the kids with the mother even though the advocate noted she lacked ability to understand the children's needs. RR-3 p. 121; RR-2 p. 45 and pp. 72-73. Consequently, considering the evidence in this case, the proof in support of Subsection O was established conclusively as a matter of law. *See J.F.C. ,* 96 S.W.3d 256, 278-79 (Tex. 2002) (because there was undisputed proof that both parents failed to comply with material provisions of the court ordered plans and those failures occurred between the time the children were removed under chapter 262 until the time of trial on orders issued during that time, the evidence conclusively established the court's finding under Subsection O "as a matter of law" even giving the parents credit for partial compliance of other tasks).

Appellant's brief argues that the order that required Daniel to comply with the service plan was not a valid order, because the family service plan did not seek reunification. However, the Department's goals in a service plan do not prevent the order from being a prerequisite for a parent to obtain reunification. As noted by this court, "[t]he order need not bear a title stating that it is an order "to obtain return of a child"; rather, it will be sufficient under subsection (O) so long as it directs a parent to perform specific acts and advises the parent that failure to provide a safe environment within a reasonable time period could result in termination of .. parental rights." *In re K.N.D.,* No. 01-12-00584-CV, 2014 WL

39

3970642, at *6 (Tex. App.—Houston [1st Dist.] Aug. 14, 2014, no pet.). This court has also noted that a trial court may direct a parent to perform specific acts for purposes of Subsection O by ordering the parent to comply with a family service plan created by the Department. *Id.* That is what the records shows in this case.

The appellant's brief also argues that there was no proof of a family service plan was ordered as it was not admitted in evidence. Nonetheless, this court has held "in a bench trial, we may 'presume the trial court took judicial notice of its record without any request being made and without any announcement that it has done so.'" *In re K.N.D.*, 2014 WL 3970642 (Tex. App. – Houston [1st Dist.] 2014, pet. denied). As such, because the clerk's record reflects Daniel's service plan was filed before the status hearing order was signed, the status hearing order incorporated that plan into its order and ordered it, we may presume the trial court took judicial notice of what the court previously ordered.

The appellant's brief also argues that the service plan was not ordered, because the Permanency Order signed in November of 2016 ordered a service plan "attached" to the order. *See* RR-5 p. 174. However, that disregards that the court previously ordered the family service plan "filed with the court" approved and made an order of the court, and the Permanency Hearing order signed in November did not vacate that order. RR-5 p. 164. In fact, the Permanency Order specifically

provided "all previous orders issued by this court shall continue without modification." RR-5 p. 174. Consequently, that does not establish that Daniel did not have a court ordered service plan. The finding under Subsection O should be affirmed.

**4) The evidence supporting the court's findings under Subsections D, E, and O of Section 161.001(1) of the Family Code adequately supported the court's finding that termination was in the child's best interest.**

In reviewing Daniel's last challenge to the sufficiency of the evidence for the trial court's best interest finding under Section 161.001(b)(2) of the Family Code, this court is guided by numerous factors in case law and the Family Code. In particular, *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976), provides a number of factors a trial court may consider in evaluating whether parental termination is in a child's best interest. Those facts include the child's desires, physical and emotional needs, emotional and physical danger to the child, parental abilities, programs to assist in promoting the child's best interest, plans by those seeking custody, stability of the home, improper parental acts and any excuse for the improper acts or omissions by the parents. Also, besides those factors, the Family Code, at Section 263.307, provides some directions in evaluating a child's best interest generally. It directs that the prompt and permanent placement of a child in a safe environment is in a child's best interest and then lists numerous

factors in evaluating a parent's willingness to provide that safe environment. *See* Tex. Fam. Code Ann. §263.307 (West 2008).

1. **Desires of Children**

The subject children were too young, at ages 3 and 5, to state their position on whether it was in their best interest that their father's parental rights be terminated and there is nothing in the record indicating they made any comments about their desires with respect to the father. RR-5 p. 143. However, this court has held when the children are too young to express their desires, the court may consider the children's bond with the foster family, whether they are well-cared by them and whether they have spent minimal time with the parent. *In re T.M.*, No. 01-16-00942-CV, 2017 WL 1885406 *9 (Tex. App. – Houston [1st Dist.] 2017, pet. denied) (mem. op.).

In this connection, the child advocate reported the children lived with the former foster family from September 2014 until February 2016 in the first case and then from May 2016 to June 2017 in this second case. RR-5 p. 147. Susan further commented that, other than the two to three months when the children were returned, Angela have been in foster placements her entire life. RR-2 p. 66.

Susan acknowledged the children were in two different foster placements. RR-2 p. 62-63. Nevertheless, her report confirmed the children were well-acquainted with this new foster home as it was in the same community as the

former foster family. RR-5 p. 146. Also, at trial, she confirmed there was significant bonding between the children and their foster parents. RR-2 p. 66. She also noted the children's needs were met, they were thriving and doing extremely well. RR-2 p. 56. In addition, the foster mother testified she wanted to adopt the children. RR-2 p. 123.

The court likely also considered that these children had negative behaviors seeing their parents and showed fear for several months with Daniel. RR-2 p. 65; RR-5 p. 145. While the play therapist has been able to calm them so that the children were seen playing happily with dad there and no overt fear being shown, that does not show the children desired to be under their father's care especially without a therapist to assist them in their fears. RR-2 p. 65.

Consequently, considering the fear these children expressed toward their father, the fact he had not provided care for these children for most of the last three years, and the children are significantly bonded and well-cared for by their current foster family, the court had more than sufficient basis to conclude that parental termination would be in the best interest of the children under the factor of the children's desires.

## 2. Present and future dangers, acts and omissions

Appellant's Brief claims there is no proof the father posed a danger to his children. That is incorrect. As already discussed in connection with the prior

discussion concerning the proof under Subsections D and E, there was undisputed proof establishing Daniel was the subject of domestic violence and sexual assault crimes in his past and maintained a pattern of behaviors that resulted in his incarceration even after his son's birth. *See In re B.D.A.*, 2018 WL 76131 (Tex. App. – Houston [1st Dist.] 2018, no pet. h.) (father's commission of felony after births of his children that resulted in his incarceration considered dangerous behavior that weighed against father in best interest analysis). In addition, there was proof of his negligent parenting in failing to properly respond to his children's special needs as well as the excessive force and punishment experienced by these children under his care. With that proof, the evidence that established these children were endangered while Daniel parented them weighed in favor of the finding that termination of Daniel's legal rights as their parent was in the children's best interest.

### 3. **Parenting Abilities and Programs.**

The Appellant's brief argues the factor concerning the father's parenting ability should weigh against parental termination, because the record shows he had a stable home and employment, completed the various tasks required by his family service plan, and the children were doing well with him during visits. However, that does not reflect a full assessment of his parenting abilities from the record.

First, as already noted above, the Department does not agree that Daniel complied with the service plan.  Though required to go to visits, court hearings and permanency hearings, the evidence shows he violated that.  Also, he did not look for the court ordered parenting classes for almost a year after it was ordered and he did not demonstrate at trial he learned to change behaviors that could result in abuse or neglect again consistent with the goals in the service plan.

Also, the therapist concluded neither parent was good at managing all three children successfully and did not think they were able to meet their special needs. RR-5 p. 145.  Further, the Child Advocate testified that the children had special needs that neither parent had total grasp.  RR-2 p. 43.  In this connection, Daniel confirmed at trial he did not know the specifics about his children's special needs. RR-2 p. 110. Considering these children had many special needs and the court ordered that the parenting classes address special needs to ensure that important aspect of serving their interests was addressed, Daniel admission about his ignorance of their special needs proved he was unable or unwilling to address them.

In contract, the foster caregivers showed the children great attention to their special needs and brought them to all their required therapy and doctor appointments. RR-2 p. 56. She stated the foster parents were also very patient with these children, gave them lots of love and support and continued to make the

45

children healthier. RR-1 p. 57. Considering these facts, the court had more than sufficient basis to find parental termination was in the children's best interest considering parenting abilities.

4. **<u>Stability and Plans</u>**

While the Appellant's Brief suggests the father was never at fault and had an appropriate plan for the children's care, the record indicates otherwise. The facts that have jeopardized stability for these children for most of their lives has mostly been the result of the behaviors and neglect of the parents. His past behaviors during the lives of his children have failed to take into account the basic and special needs of his children, and the trier of fact did not have to believe he had any better ability by the time of this trial, especially when he admitted he still did not know his children's special needs. Consequently, the court had more than sufficient basis on to terminate Daniel's parental rights so that the children could be adopted by foster parents who had addressed the children's special needs and wanted to adopt them. Because the need for permanence is a paramount consideration in determining a child's present and future needs, the court had more than sufficient basis to find termination of Daniel's parental rights was in the children's best interest. *See In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App. – Houston [14th Dist.] 2016, pet. denied); *Jordan*, 325 S.W.3d at p. 731; *Also see*

Tex. Fam. Code Ann. §263.307(a) (prompt and permanent placement in child's best interest). The judgment should be affirmed.

WHEREFORE, PREMISES CONSIDERED, the Department prays that this court affirm the trial court's judgment and for such other and further relief to which it may be entitled in law or in equity.

Respectfully submitted,

VINCE RYAN
COUNTY ATTORNEY

By: */s/ Sandra Hachem*
**Sandra Hachem**,
Assistant County Attorney
State Bar #08667060
1019 Congress, 17th Floor,
Houston, Texas 77002
Phone: 713/274-5293; Fax: 713/437-4700
Email: Sandra.Hachem@cao.hctx.net
Attorney for Appellee,
Department of Family & Protective Services

## CERTIFICATE OF SERVICE

I hereby certify that on this the 25th day of May, 2018, a true and correct copy of the foregoing Appellee's brief was sent to all parties to this appeal by sending a copy of this brief by electronic transmission to:

**Appellant, Daniel**
c/o his attorney of record William Thursland
by email at wmthursland@hotmail.com

**and**

47

**Attorney Ad Litem for the Child**
 Sylvia Yvonne Escobedo by email at sylviaescobedo@me.com.


                                        */s/ Sandra Hachem*
                                        Sandra Hachem

## CERTIFICATE OF COMPLIANCE OF NUMBER OF WORDS

This is to certify, pursuant to Tex. R. App. P. 9.4(i)(3), that the foregoing computer generated brief consists of no more than 15,000 words, excluding the caption, identify of parties and counsel, table of contents, index of authorities, statement of the case, statement of issues presented, statement of procedural history, signature, proof of service, certification, certificate of compliance and appendix.  Relying on the word count of the computer program used to prepare this document, the number of words, subject to count under the rules, is 11,937 words.

                                        */s/ Sandra Hachem*
                                        Sandra Hachem

No. 01-18-00023-CV
In the Court of Appeals for the
First District of Texas at Houston, Texas
_____

In the Interest of J.I.G. & A.D.G., Children
_____

**D.C.G., Appellant**

**v.**

**Department of Family & Protective Services, Appellee**

_____

**APPENDIX**
_____

**DESCRIPTION**                                              **ATTACHMENT NO.**

Emergency Order
    Signed May 24, 2016
    Image Number 70417014                              1

Temporary Order Following Adversary Hearing Order
    Signed July 14, 2016
    Image Number 711110358                             2

**Tab 1**

**Emergency Order
Signed May 24, 2016
Image Number 70417014**

5/24/2016 11:00:37 AM
Chris Daniel - District Clerk
Harris County
Envelope No: 10789464
By: EVERS, LONNA K
Filed: 5/24/2016 11:00:37 AM

2016-03202J / Court: 314

**ORIGINAL**

NOTICE: THIS DOCUMENT
CONTAINS SENSITIVE DATA

MICHAEL EJEH 176-7
LOREE GEISELHART 176-7

CAUSE NO. _____

| | |
|---|---|
| IN THE INTEREST OF | IN THE DISTRICT COURT OF |
| J███ I██ G██████ | |
| A██████ G████ | HARRIS COUNTY, TEXAS |
| **CHILDREN** | 315 JUDICIAL FAMILY/JUVENILE DISTRICT |

## ORDER FOR PROTECTION OF A CHILD IN AN EMERGENCY
## AND NOTICE OF HEARING

On **May 24, 2016**, the Department of Family and Protective Services ("the Department") presented its Petition to the Court.

1. **Appearances**

1.1. The Department of Family and Protective Services ("the Department") appeared through **MICHAEL EJEH**, caseworker, and by attorney and announced ready.

1.2. Respondent MOTHER A██████ M████ D████
☐ appeared in person and announced ready.
☐ appeared through attorney of record _____ and announced ready.
☑ appeared in person and through attorney of record Bryan Mitchell, and announced ready.
☐ waived issuance and service of citation by waiver duly filed.
☐ agreed to the terms of this order as evidenced by signature below.
☐ although duly and properly notified, did not appear and wholly made default.
☐ was not notified, and did not appear.

1.3. Respondent ALLEGED FATHER D████ C████████ G████
☐ appeared in person and announced ready.
☐ appeared through attorney of record _____ and announced ready.
☑ appeared in person and through attorney of record Chauм Hubbard and announced ready.
☐ waived issuance and service of citation by waiver duly filed.
☐ agreed to the terms of this order as evidenced by signature below.
☐ although duly and properly notified, did not appear and wholly made default.
☐ was not notified, and did not appear.

(faleinn)

RECORDER'S MEMORANDUM  May 24, 2016
This instrument is of poor quality
at the time of imaging

**1.4.** Respondent **UNKNOWN FATHER**
- ☐ appeared in person and announced ready.
- ☐ appeared through attorney of record _____ and announced ready.
- ☐ appeared in person and through attorney of record _____ and announced ready.
- ☐ waived issuance and service of citation by waiver duly filed.
- ☐ agreed to the terms of this order as evidenced by signature below.
- ☐ although duly and properly notified, did not appear and wholly made default.
- ☑ was not notified, and did not appear.

**1.5.** _Sylvia Escobedo_, appointed by the Court as Attorney and Guardian Ad Litem of the children the subject of this suit,
- ☐ appeared and announced ready.
- ☐ agreed to the terms of this order.
- ☐ agreed to the terms of this order, but did not appear
- ☐ although duly and properly notified, did not appear.

**1.6.** Also Appearing _M███████, R██████, Children's_
_maternal grandmother_ _____
_____

## 2. Jurisdiction

Having examined the pleadings and reviewed the evidence, the Court finds that it has jurisdiction of this cause under §262.002, Texas Family Code.

## 3. Findings

3.1. Having examined and reviewed the evidence, including the sworn affidavit accompanying the petition and based upon the facts contained therein, the Court finds that all reasonable efforts, consistent with time and circumstances have been made by the Petitioner to prevent or eliminate the need for removal of the children the subject of this suit from the home and to make it possible for the children to return home, but continuation in the home would be contrary to the children's welfare.

3.2. The Court finds that the children have been removed pursuant to §262.104, Texas Family Code, and further finds that:

3.2.1. there is a continuing danger to the physical health or safety of the children if returned to the parent, managing conservator, possessory conservator, guardian, caretaker, or custodian who was entitled to possession of the children.

or the children have been the victims of sexual abuse or trafficking under §§20.A.02 or 20.A.03, Penal Code, on one or more occasions and there is a substantial risk that the children will be the victims of sexual abuse or trafficking in the future.

3.2.2. and nature of the emergency and the continuing danger to the welfare of the children make efforts to allow the children to remain with or return to the person entitled to possession of the children impossible or unreasonable.

3.3. The Court finds that the following temporary orders are in the best interests of the children the subject of this suit.

## 4. Emergency Temporary Orders

4.1. **IT IS ORDERED** that the Department is named temporary sole managing conservator of the children, with all of the rights and duties listed in §153.371, Texas Family Code, until a full adversary hearing is held.

4.1.1. **IT IS ORDERED** that in addition to the rights and duties listed in §153.371, Texas Family Code, the Department its employee or designee is authorized to consent to medical care of the subject children, pursuant to §266.004, Texas Family Code, until a full adversary hearing is held.

4.2. **IT IS ORDERED** that each Parent, Alleged Father or Relative to this cause provide to the Department and the Court the full name and current address or whereabouts and phone number of any absent parent of the children the subject of this suit, pursuant to Rule 194, Texas Rules of Civil Procedure.

4.3. **IT IS ORDERED** that each Parent, Alleged Father or Relative of the children before the Court submit the Child Placement Resources Form provided under §261.307, if the form has not previously been provided within three days of the signing of this order and provide the Department and the Court the full name and current address or whereabouts and phone number of any and all relatives of the children the subject of this suit with whom the Department may place the children during the pendency of this suit, pursuant to Rule 197, Texas Rules of Civil Procedure, and §262.201, Texas Family Code.

4.4. **IT IS ORDERED** that each parent of the children the subject of this suit furnish to the Department and the Court information sufficient to accurately identify that parent's net resources and ability to pay child support along with copies of income tax returns for the past two years, any financial statements, bank statements, and current pay stubs, pursuant to Rule 196, Texas Rules of Civil Procedure and §154.063, Texas Family Code.

4.5. **IT IS ORDERED** that each parent of the children the subject of this suit provide to the Department and the Court evidence of health insurance available for the

Certified Document Number: 70417014 - Page 3 of 9

children, pursuant to Rule 196, Texas Rules of Civil Procedure and §154.182, Texas Family Code.

4.6. **IT IS ORDERED** that each Respondent provide the Department and the Court information sufficient to establish the parentage and immigration status of the children, including but not limited to marriage records, birth or death certificates, baptismal records, social security cards, records of lawful permanent residence ("green cards"), naturalization certificates, and any other records of the United States Citizenship and Immigration Services and records of Indian ancestry or tribal membership..

4.7. **IT IS ORDERED** that each Respondent furnish to the Department all information necessary to ensure the Department has an adequate medical history for the children, including but not limited to the immunization records for the children and the names and addresses of all treating physicians. **IT IS FURTHER ORDERED** that each parent provide the medical history of the parent and the parent's ancestors on the medical history report form, pursuant to §161.2021, Texas Family Code.

4.8. **IT IS ORDERED** that each Respondent provide the Department with any information regarding whether the children or the children's family has Native American heritage and identify any Native American tribe with which the children may be associated and provide all available family history information relevant to determination of Indian child status on request.

4.9. **IT IS ORDERED** that all of the information required above be provided as ordered no later than the date of the full adversary hearing held in this cause.

4.10. **IT IS ORDERED** that, no later than the date of the full adversary hearing, the Department shall perform a background and criminal history check of any relative or other designated individuals identified as a potential relative or designated caregiver, as defined by §264.751, on the proposed child placement resource form provided under §261.307, if said form has been completed and provided by either parent and other person having legal custody of the child. The time frame does not apply to relative or other designated individual located in another state

4.11. **IT IS ORDERED** that the Department shall evaluate each person listed on the child resource form to determine the relative or other designated individual who would be the most appropriate substitute caregiver for the child and must complete a home study on the most appropriate substitute caregiver, if any, before the full adversary hearing. The time frame does not apply to a relative or other designated individual located in another state.

4.12. **IT IS ORDERED** that until the Department identifies a relative or other designated individual qualified to be a substitute caregiver, the Department must continue to explore substitute caregiver options.

4.13. **IT IS ORDERED** that, at the full adversary hearing under §262.201, the Department shall, after redacting any social security number, file with the court; (1) copy of each proposed child placement resource form completed by the parent or other person having legal custody of the child; (2) a copy of any completed home study performed under Subsection (a); and the name of the relative or other designated caregiver, if any, with whom the child has been placed.

4.14. **IT IS ORDERED** that if the children have not been placed with a relative or other designated caregiver by the time of the full adversary hearing under §262.201, the Department shall file with the court a statement that explains the reasons why the Department has not placed the children with a relative or other designated caregiver listed on the proposed child placement resources form and the actions the Department is taking, if any, to place the children, J̲▮ I̲▮ G̲▮ AND A̲▮ G̲▮ with a relative or other designated caregiver.

4.15. **IT IS ORDERED** the Department shall conduct a home assessment on the children's maternal grandmother, M▮ R▮ and if results are favorable commence a formal home study on the maternal grandmother.

## 5. Conservatorship

5.1. The Court makes no finding at this time with regard to the appointment of a Temporary Possessory Conservator.

[or]

IT IS THEREFORE ORDERED that _____ is appointed Temporary Possessory Conservator of the child, J̲▮ I̲▮ G̲▮, with the limited rights and duties set forth below.

IT IS THEREFORE ORDERED that _____ is appointed Temporary Possessory Conservator of the child, A̲▮ G̲▮, with the limited rights and duties set forth below.

## 6. Rights and Duties of ~~Temporary Possessory~~ Parent

6.1. Each Temporary Possessory Conservator appointed in this Order shall have the following rights:

6.1.1. the right to receive information concerning the health, education, and welfare of the children;

6.1.2. the right to access to medical, dental, psychological, and educational records of the children;

6.1.3.   the right to consult with a physician, dentist, or psychologist of the children;

6.1.4.   the right to consult with school officials concerning the children's welfare and educational status, including school activities;

~~6.1.5.~~   ~~the right, during times of unsupervised possession, to consent for the child to medical, dental, and surgical treatment during an emergency involving immediate danger to the health and safety of the children;~~

~~6.1.6.~~   ~~the right, during times of possession, to direct the moral and religious training of the children;~~

and the right to _____

~~_____~~

6.2.   Each Temporary Possessory Conservator appointed in this Order shall have the following duties:

~~6.2.1.~~   ~~the duty, during periods of possession of the children which are not supervised by the Department or its designee, of care, control, protection, and reasonable discipline of the children;~~

6.2.2.   the duty to support the children ~~, including providing the children with clothing, food, and shelter during periods of possession of the children which are not supervised by the Department or its designee;~~

## 7.   Full Adversary Hearing

A full adversary hearing under §262.201, Texas Family Code will be held at the time and place set out below.  At this hearing, the Court will consider issuing the following temporary orders:

7.1.   a provision appointing the Department temporary sole managing conservator of the children, with all of the rights and duties listed in §153.371, Texas Family Code, pending the final disposition of this suit;

7.2.   an authorization of the Department or its employee or designee to consent to medical care of the subject children, pursuant to §266.004, Texas Family Code;

7.3.   a provision pursuant to §154.001(b), Texas Family Code, ordering the parents of the children to make payments for the temporary support of the children, pending final disposition of this suit, these child support payments to be withheld from their disposable earnings;

7.4. a provision ordering the parents of the children to submit to a family assessment to be conducted by the Children's Crisis Care Center and further that such assessments shall be shared with all other groups or persons, including the Permanency Planning Team, as deemed necessary by the Department;

7.5. a provision ordering the parents of the children to comply with each requirement set out in the Department's original, or any amended, service plan during the pendency of this suit, as provided by §§263.106 and 153.602, Texas Family Code;

7.6. a provision ordering the Respondents to provide the Court and the Department with a current residence address and telephone number, at which each can be contacted;

7.7. a provision ordering the Respondents to notify the Court and the Department of any change in his or her residence address or telephone number within five (5) days of a change of address or telephone number;

7.8. a provision pursuant to §107.013(a)(1), Texas Family Code, appointing an attorney *ad litem* to represent the interests of each indigent parent who responds in opposition to the suit affecting the parental rights;

7.9. a provision ordering Respondents, **A███ M███ D███** and **D███ C███ G███**, to execute an authorization for the release of Respondents', and the children's (if needed) past, current or future medical and mental health records to the Department from all physicians, psychologists, or other health care professionals, who have treated Respondents or their children, which information the Department shall be authorized to share with all other groups or persons it deems necessary; and to further provide the Department with a list of the names and addresses of all physicians, psychologists, or other healthcare providers who have treated Respondents or the children.

## 8. Ad litem Appointments

8.1. The Court finds that appointment of an attorney ad litem for the children is mandatory under §107.012, Texas Family Code. **IT IS ORDERED** that _____Sylvia Escobedo_____, a licensed attorney at law of this state, is appointed to represent the children the subject of this suit in a manner as set forth in §§107.003 and 107.004, Texas Family Code.

8.2. The Court finds that appointment of a guardian ad litem for the children is mandatory under §107.001, Texas Family Code. **IT IS ORDERED** that _____Sylvia Escobedo_____, a licensed attorney at law of this state, is appointed to represent the interest of the children the subject of this suit in a manner as set forth in § 107.002, Texas Family Code.

8.3. The Court finds that appointment of an attorney ad litem for the Respondents may be mandatory under §107.013, Texas Family Code. **IT IS ORDERED** that Respondents appear at the adversary hearing with all pertinent information

regarding Their income and that upon a showing of indigency and opposition to the suit affecting the parent-child relationship that a licensed attorney at law of this state, will be appointed to represent Respondents.

9. **Access to Children and Information Relating to the Children**

9.1.  **IT IS ORDERED** that except as provided in §107.006(c) of the Texas Family Code, the attorney *ad litem* for the children, or guardian *ad litem* for the children herein named and appointed by the Court shall have immediate access to:

9.1.1.  the children, J███ I███ G███ AND A███ G███; and

9.1.2.  any information relating to the children, J███ I███ G███ AND A███ G███.

9.2.  Without requiring a further order or release, the custodian of any relevant records relating to the children, J███ I███ G███ AND A███ G███, including records regarding social services, law enforcement records, school records, records of a probate or court proceeding, and records of a trust or account for which the children are beneficiaries, shall provide access to the attorney *ad litem* for the children, or guardian *ad litem* for the children herein named and appointed by the Court to access the records under §107.006(a) of the Texas Family Code.

9.3.  A medical, mental health, or drug or alcohol treatment record of a child that is privileged or confidential under law may be released to the attorney *ad litem* for the children, or guardian *ad litem* for the children herein named and appointed by the Court only in accordance with the other law, pursuant to §107.006(c), Texas Family Code.

10. **Notice to Parents**

"YOU HAVE THE RIGHT UNDER §262.102(d), TEXAS FAMILY CODE, TO BE REPRESENTED BY AN ATTORNEY. IF YOU ARE INDIGENT AND UNABLE TO AFFORD AN ATTORNEY, YOU HAVE THE RIGHT TO REQUEST THE APPOINTMENT OF AN ATTORNEY BY CONTACTING THE COURT AT The 315th JUDICIAL DISTRICT COURT OF HARRIS COUNTY, THE JUVENILE JUSTICE CENTER, 1200 CONGRESS, HOUSTON, Texas 77002. IF YOU APPEAR IN OPPOSITION TO THE SUIT, CLAIM INDIGENCE, AND REQUEST THE APPOINTMENT OF AN ATTORNEY, THE COURT WILL REQUIRE YOU TO SIGN AN AFFIDAVIT OF INDIGENCE AND THE COURT MAY HEAR EVIDENCE TO DETERMINE IF YOU ARE INDIGENT. IF THE COURT DETERMINES YOU ARE INDIGENT AND ELIGIBLE FOR APPOINTMENT OF AN ATTORNEY, THE COURT WILL APPOINT AN ATTORNEY TO REPRESENT YOU."

Certified Document Number: 70417014 - Page 8 of 9

**11.    Dismissal Date and Notice of Full Adversary Hearing:**

Pursuant to §263.306(11), Texas Family Code, the Court determines that the date for dismissal of this cause shall be _____ 5/29/17 _____ .

Notice is given to Respondents A████ M████ D███, and D███ C█████ G█████ that this cause is set for a full adversary hearing on ____ 6/6/16 ____, at 9:30 o'clock A.m. in the 315 Judicial District Court of Harris County, in Houston, Texas.

SIGNED this _____ day of MAY 2 4 2016 , 2016.

_____
MASTER OF THE COURT

SIGNED this _____ day of MAY 2 4 2016 , 2016.

_____
JUDGE PRESIDING

Certified Document Number: 70417014 - Page 9 of 9



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   May 15, 2018

Certified Document Number:        70417014 Total Pages:  9

Chris Daniel, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

**Tab 2**

**Temporary Order Following Adversary Hearing Order**
**Signed July 14, 2016**
**Image Number 711110358**

ORIGINAL

5/24/2016 11:00:37 AM
Chris Daniel - District Clerk
Harris County
Envelope No: 10789464
By: EVERS, LONNA K
Filed: 5/24/2016 11:00:37 AM

P.13

+MCjX

## 2016-03202J / Court: 314

NOTICE: THIS DOCUMENT
CONTAINS SENSITIVE DATA

MICHAEL EJEH 176-7
LOREE GEISELHART 176-7

CAUSE NO. 2016-03202J

| IN THE INTEREST OF | IN THE DISTRICT COURT OF |
|---|---|

J██ I██ G██
A██ G██

HARRIS COUNTY, TEXAS

CHILDREN          315th JUDICIAL FAMILY/JUVENILE DISTRICT

### TEMPORARY ORDER FOLLOWING ADVERSARY HEARING

On 07-13-2016, a full adversary hearing pursuant to §262.201 or
262.205, Texas Family Code, was held in this cause.

1. **Appearances**

   1.1. The Department of Family and Protective Services ("the Department") appeared through **MICHAEL EJEH**, caseworker, and by attorney and announced ready.

   1.2. Respondent MOTHER A██ M██ D██
   ☐ appeared in person and announced ready.
   ☑ appeared through attorney of record *Ryan Mitchell* and announced ready.
   ☐ appeared in person and through attorney of record _____ and announced ready.
   ☐ waived issuance and service of citation by waiver duly filed.
   ☐ agreed to the terms of this order as evidenced by signature below.
   ☐ although duly and properly notified, did not appear and wholly made default.
   ☐ was not notified, and did not appear.

   1.3. Respondent ALLEGED FATHER D██ C██ G██
   ☐ appeared in person and announced ready.
   ☑ appeared through attorney of record *Chaun Hubbard* and announced ready.
   ☐ appeared in person and through attorney of record _____ and announced ready.
   ☐ waived issuance and service of citation by waiver duly filed.
   ☐ agreed to the terms of this order as evidenced by signature below.
   ☐ although duly and properly notified, did not appear and wholly made default.
   ☐ was not notified, and did not appear.

RECORDER'S MEMORANDUM          (falsinn)
This Instrument is of poor quality          May 24, 2016
at the time of imaging.

Certified Document Number: 71110358 - Page 1 of 13

Certified Document Number: 71110358 - Page 2 of 13

1.4.    Respondent **UNKNOWN FATHER**
- ☐ appeared in person and announced ready.
- ☐ appeared through attorney of record _____ and announced ready.
- ☐ appeared in person and through attorney of record _____ and announced ready.
- ☐ waived issuance and service of citation by waiver duly filed.
- ☐ agreed to the terms of this order as evidenced by signature below.
- ☐ although duly and properly notified, did not appear and wholly made default.
- ☒ was not notified, and did not appear.

1.5.    _Sylvia Escobedo_ appointed by the Court as Attorney and Guardian Ad Litem of the children the subject of this suit,
- ☐ appeared and announced ready.
- ☐ agreed to the terms of this order.
- ☐ agreed to the terms of this order, but did not appear
- ☐ although duly and properly notified, did not appear.

1.6.    Also Appearing _Child Advocates, Inc., Guardian Ad Litem for the children_

## 2. Jurisdiction

2.1.    The Court, after examining the record and hearing the evidence and argument of counsel, finds that all necessary prerequisites of the law have been satisfied and that this Court has jurisdiction of this case and of all the parties.

2.2.    The Court further finds that the State of Texas has jurisdiction of this case pursuant to Subchapter C, Chapter 152, Texas Family Code, because Texas has been the home state of the children for at least six months prior to the date of the commencement of this proceeding, and no parent or person acting as a parent continues to live in the state where an initial child custody determination was made.

## 3. Indian Child Welfare Act

The Court has inquired whether the children's family has Native American heritage and identified any Native American Tribe with which the children may be associated.

## 4. Findings

4.1.    The Court finds there is sufficient evidence to satisfy a person of ordinary prudence and caution that: (1) there was a danger to the physical health or safety of the children which was caused by an act or failure to act of the person entitled to possession and for the children to remain in the home is contrary to the welfare of

the children; (2) the urgent need for protection required the immediate removal of the children and makes efforts to eliminate or prevent the children's removal impossible or unreasonable; and (3) notwithstanding reasonable efforts to eliminate the need for the children's removal and enable the children to return home, there is a substantial risk of a continuing danger if the children are returned home.

4.2. The Court finds sufficient evidence to satisfy a person of ordinary prudence and caution that there is a continuing danger to the physical health or safety of the children and for the children to remain in the home is contrary to the welfare of the children.

4.3. The Court finds with respect to the J██████ I██████ G██████ AND A██████████ G█████, that reasonable efforts consistent with the children's health and safety have been made by the Department to prevent or eliminate the need for removal of the children from the home and to make it possible for the children to return home, but that continuation in the home would be contrary to the welfare of the children.

4.4. The Court finds that placement of the children with the children's noncustodial parent or with a relative of the children is inappropriate and not in the best interest of the children.

4.5. The Court finds that appointment of the parent or parents as managing conservator of the children is not in the best interest of the children because the appointment would significantly impair the children's physical health or emotional development.

4.6. The Court finds that the following orders for the safety and welfare of the children are in the best interest of the children.

5. **Appointment of Counsel for Parents or Parties**

5.1. The Court finds that A██████ M█████ D█████ is/ is not indigent. Based on the finding that A██████ M█████ D████ is not indigent and pursuant to §107.015 of the Texas Family Code, IT IS ORDERED that A██████ M█████ D████ is responsible to pay a reasonable fee in the amount set by the Court by separate order to the attorney ad litem appointed to represent the children, J████ I██████ G█████ AND A██████████ G█████.

5.2. The Court finds that D█████ C███████████ G███████ is/ is not indigent. Based on the finding that D█████ C███████ G███████ is not indigent and pursuant to §107.015 of the Texas Family Code, IT IS ORDERED that D█████ C███████ G█████ is responsible to pay a reasonable fee in the amount set by the Court by separate order to the attorney ad litem appointed to represent the children, J█████ I█████ G█████ AND/OR A██████████ G█████.

The Court makes no finding with regard to the indigency of Respondent because said Respondent is not presently before the Court and/or insufficient information is available to make such a determination at this time.

6. **Appointment of Single Counsel for Both Parents**

The Court finds that the interests of both indigent parents who have responded in opposition to the termination of the parent-child relationship are not in conflict, and therefore has appointed a single attorney *ad litem* to represent the interests of both parents.

7. **Conservatorship**

7.1. **IT IS ORDERED** that the Department of Family and Protective Services is appointed Temporary Managing Conservator of the following children:

| | |
|---|---|
| Name: | J▇▇ I▇▇ G▇▇ |
| Sex: | **MALE** |
| Date of Birth: | ▇▇▇ |
| Indian Child Status: | **UNKNOWN** |

| | |
|---|---|
| Name: | A▇▇ G▇▇ |
| Sex: | **FEMALE** |
| Date of Birth: | ▇▇▇ |
| Indian Child Status: | **UNKNOWN** |

7.2. **IT IS ORDERED** that the Temporary Managing Conservator shall have all the rights and duties set forth in §153.371, Texas Family Code.

7.2.1. **IT IS ORDERED** that in addition to the rights and duties listed in §153.371, Texas Family Code, the Department its employee or designee is authorized to consent to medical care of the subject children, pursuant to §266.004, Texas Family Code.

~~OR~~

~~The Court authorizes _____ to consent to medical care of the subject children, pursuant to §266.004(b)(1), Texas Family Code. This authorization is limited to the provision of medical care services provided by the Medicaid program.~~

7.3. The Court finds that it is in the best interest of the children to limit the rights and duties of each parent ~~appointed as a temporary possessory conservator.~~

7.4. The Court makes no finding at this time with regard to the appointment of a Temporary Possessory Conservator.

Certified Document Number: 71110358 - Page 4 of 13



[or]

7.5. IT IS THEREFORE ORDERED that _____ is appointed Temporary Possessory Conservator of the child, J█████ ██ G█████, with the limited rights and duties set forth below.

7.6. IT IS THEREFORE ORDERED that _____ is appointed Temporary ~~Possessory~~ Conservator of the child, A█████ G█████, with the limited rights and duties set forth below.

8. Rights and Duties of Temporary ~~Possessory~~ Parent

8.1. Each Temporary ~~Possessory Conservator appointed in this Order~~ Parent shall have the following rights:

   8.1.1. the right to receive information concerning the health, education, and welfare of the children;

   8.1.2. the right to access to medical, dental, psychological, and educational records of the children;

   8.1.3. the right to consult with a physician, dentist, or psychologist of the children;

   8.1.4. the right to consult with school officials concerning the children's welfare and educational status, including school activities;

   8.1.5. the right, during times of unsupervised possession, to consent for the child to medical, dental, and surgical treatment during an emergency involving immediate danger to the health and safety of the children;

   8.1.6. the right, during times of possession, to direct the moral and religious training of the children;

and the right to _____
_____
_____
_____

8.2. Each Temporary ~~Possessory Conservator appointed in this Order~~ Parent shall have the following duties:

   8.2.1. the duty, during periods of possession of the children which are not supervised by the Department or its designee, of care, control, protection, and reasonable discipline of the children;

Certified Document Number: 71110358 - Page 5 of 13

8.2.2. the duty to support the children, including providing the children with clothing, food, and shelter during periods of possession of the children which are not supervised by the Department or its designee;



and the duty to



### 8.3. Possession of and Access to the children

8.3.1. The Court finds that the application of the guidelines for possession of and access to the children, as set out in Subchapter F, Chapter 153, Texas Family Code, is not in the children's best interest. **IT IS ORDERED** that the parent named as temporary possessory conservator of the children shall have limited access to and possession of the children as set forth below.

The Court finds that the parents shall have the right to visitation with the children in accordance with the policy established by Department of Family and Protective Services and at all other times mutually agreeable to the Temporary Managing Conservator and the parents of said children.



8.3.2. **IT IS ORDERED** that each Temporary Possessory Conservator appointed in this Order shall have visitation with the children as follows:

### 9. Child Support

The Court finds that the parents have a duty to support the child the subject of this suit.



**IT IS ORDERED** that child support shall be paid as set out in Exhibit A attached hereto and incorporated fully herein.



The Court makes no finding at this time with regard to the payment of child support.

Certified Document Number: 71110358 - Page 6 of 13

**IT IS ORDERED** that any child support ordered to be paid for the support of the children as a result of any prior court order be ordered to be redirected and paid to the Texas Department of Family and Protective Services.

### 10. Medical Support

The Court finds that the parents have a duty to provide medical for the child the subject of this suit.

~~IT IS ORDERED that medical support shall be paid as set out in Exhibit A attached hereto and incorporated fully herein.~~

[or]

The Court makes no finding at this time with regard to the payment of medical support.

### 11. Release of Medical and Mental Health Records

**IT IS ORDERED** that Respondents A▮▮▮ M▮▮▮ D▮▮▮ and D▮▮▮ C▮▮▮ G▮▮▮ execute an authorization for the release of Respondents', and the children's (if needed) past, current or future medical and mental health records to the Department from all physicians, psychologists, or other health care professionals, who have treated Respondents or their children which information the Department shall be authorized to share with all other groups or persons it deems necessary; and to further provide the Department with a list of the names and addresses of all physicians, psychologists, or other healthcare providers who have treated Respondents or the children.. Respondents shall execute the authorization and deliver it, together with the list of physicians, psychologists, or other healthcare providers, to the Department within 15 days of the date of this hearing.

### 12. Required Home Study

12.1. The Court finds that Respondent Mother, A▮▮▮ M▮▮▮ D▮▮▮, has/~~has not~~ submitted the Child Placement Resources Form required under §261.307, Texas Family Code.

12.2. The Court finds that Respondent Father, D▮▮▮ C▮▮▮ G▮▮▮, has/~~has not~~ submitted the Child Placement Resources Form required under §261.307, Texas Family Code.

12.3. **IT IS ORDERED** that each Parent, Alleged Father or Relative of the subject children before the Court submit the Child Placement Resources Form provided under §261.307, if the form has not previously been provided and provide the Department and the Court the full name and current address or whereabouts and phone number of any and all relatives of the subject children the subject of this suit

Certified Document Number: 71110358 - Page 7 of 13

with whom the Department may place the subject children during the pendency of this suit, pursuant to §262.201, Texas Family Code.

12.4. **IT IS ORDERED** that the Department shall continue to evaluate substitute caregiver options until the Department identifies a relative or other designated individual qualified to be a substitute caregiver.

12.5. **IT IS ORDERED** that the Department shall conduct a home/social study on _____, if preliminary criminal and CPS background checks of all members of the household age 14 and up are favorable

13. **FINDING AND NOTICE**

**THE COURT FINDS AND HEREBY NOTIFIES THE PARENTS THAT EACH OF THE ACTIONS REQUIRED OF THEM BELOW ARE NECESSARY TO OBTAIN THE RETURN OF THE CHILDREN, AND FAILURE TO FULLY COMPLY WITH THESE ORDERS MAY RESULT IN THE RESTRICTION OR TERMINATION OF PARENTAL RIGHTS.**

14. ~~Compliance with Service~~ The Service Plan

14.1. A████ M████ D████ is **ORDERED**, pursuant to §263.106 Texas Family Code, to comply with each requirement set out in the Department's original, or any amended, service plan during the pendency of this suit.

14.2. D█ C████████ G████ is **ORDERED**, pursuant to §263.106 Texas Family Code, to comply with each requirement set out in the Department's original, or any amended, service plan during the pendency of this suit.

14.3. IT IS FURTHER ORDERED that:



14.4. The court finds that this order, as supplemented by the service plan to be approved at the Status Hearing under Texas Family Code §263.201, sufficiently defines the rights and duties of the parents of the child pursuant to Texas Family Code §153.602 and satisfies the requirements of a parenting plan. To the extent there is evidence demonstrating that the children have been exposed to harmful parental conflict, the court orders that the Department address this issue in the Family Plan of Service.

## 15. Required Information

**15.1.** **IT IS ORDERED** that each Respondent to this cause provide to the Department and the Court, no later than thirty days from the date of this hearing, the information detailed below.

**15.2.** **IT IS ORDERED** that each Respondent to this cause provide to the Department and the Court the full name and current address or whereabouts and phone number of any absent parent of the children the subject of this suit, pursuant to Rule 194, Texas Rules of Civil Procedure.

**15.3.** **IT IS ORDERED** that each Respondent to this cause submit the Child Placement Resources Form provided under §261.307, Texas Family Code, if the form has not been previously provided and provide to the Department and the Court the full name and current address or whereabouts and phone number of any relative of the children the subject of this suit with whom the Department may place the children during the pendency of this suit, pursuant to Rule 197, Texas Rules of Civil Procedure, and §262.201(e), Texas Family Code.

**15.4.** **IT IS ORDERED** that each Parent furnish information sufficient to accurately identify that parent's net resources and ability to pay child support along with copies of income tax returns for the past two years, any financial statements, bank statements, and current pay stubs, pursuant to Rule 196, Texas Rules of Civil Procedure., and §154.063, Texas Family Code.

**15.5.** **IT IS ORDERED** that each Respondent provide the Department and the Court information sufficient to establish the parentage and immigration status of the children, including but not limited to marriage records, birth or death certificates, baptismal records, social security cards, records of lawful permanent residence ("green cards"), naturalization certificates, and any other record of the United States Citizenship and Immigration Services and records of Indian ancestry or tribal membership.

**15.6.** **IT IS ORDERED** that each Respondent provide the Department with any information regarding whether the children or the children's family has Native American heritage and identify any Native American Tribe with which the children may be associated and provide all available family history information relevant to determination of Indian child status on request.

**15.7.** **IT IS ORDERED** that each Respondent furnish to the Department all information necessary to ensure the Department has an adequate medical history for the children, including but not limited to the immunization records for the children and the names and addresses of all treating physicians.

15.8. **IT IS ORDERED** that each Respondent provide the Department information regarding the medical history of the parent and parent's ancestors on the medical history report form, pursuant to §161.2021, Texas Family Code.

15.9. **IT IS ORDERED** that each Respondent to this cause provide to the Department and the Court a current residence address and telephone number at which each can be contacted.

15.10. **IT IS ORDERED** that each Respondent to this cause notify the Department and the Court of any change in his or her residence address or telephone number within five (5) days of a change of address or telephone number.

16. **Duty To Provide Information**

16.1. **IT IS ORDERED** pursuant to §153.076(a), Texas Family Code that each conservator of a child has a duty to inform the other conservator of the child in a timely manner of significant information concerning the health, education, and welfare of the child.

16.2. **IT IS ORDERED** pursuant to §153.076(b), Texas Family Code, that each conservator of the child has the duty to inform the other conservator if the conservator resides with for at least 30 days, marries, or intends to marry a person who the conservator knows:

16.2.1. is registered as a sex offender under Chapter 62, Code of Criminal Procedure; or

16.2.2. is currently charged with an offense for which on conviction the person would be required to register under that chapter.

16.3. The notice required to be made under §153.076(b), Texas Family Code, must be made as soon as practicable but not later than the 40th day after the date the conservator of the child begins to reside with the person or the 10th day after the date the marriage occurs, as appropriate. The notice must include a description of the offense that is the basis of the person's requirement to register as a sex offender or of the offense with which the person is charged.

16.4. **IT IS ORDERED** pursuant to §153.076(b-1), Texas Family Code, that each conservator of J███ I███ G███ AND A███ G███ has the duty to inform the other conservator of the children if the conservator:

16.4.1. Establishes a residence with a person who the conservator knows is the subject of a final protective order sought by an individual other than the conservator that is in effect on the date the residence with the person is established; pursuant to §153.076(b-1)(1), Texas Family Code, or

16.4.2. Resides with, or allows unsupervised access to a child by, a person who is the subject of a final protective order sought by the conservator after the expiration of the 60 day period following the date the final protective order is issued, pursuant to §153.076(b-1)(2), Texas Family Code, or

16.4.3. Is the subject of a final protective order issued after the date of the order establishing conservatorship, pursuant to §153.076(b-1)(3), Texas Family Code.

16.5. The notice required to be made under §153.076(b-1), Texas Family Code, must be made as soon as practicable but not later than:

16.5.1. The 30th day after the date the conservator establishes residence with the person who is the subject of the final protective order, if notice is required by §153.076(b-1)(1), Texas Family Code or

16.5.2. The 90th day after the date the final protective order was issued, if notice is required by subsection §153.076(b-1)(2), Texas Family Code above; or

16.5.3. The 30th day after the date the final protective order was issued, if notice is required by subsection §153.076(b-1)(3), Texas Family Code above.

16.6. A CONSERVATOR COMMITS AN OFFENSE IF THE CONSERVATOR FAILS TO PROVIDE NOTICE IN THE MANNER REQUIRED BY SUBSECTIONS (b) AND (c), OR SUBSECTIONS (b-1) AND (c-1), AS APPLICABLE, OF §153.076, Texas Family Code. AN OFFENSE UNDER THIS SUBSECTION (d) IS A CLASS C MISDEMEANOR

16.7. "YOU HAVE THE RIGHT UNDER §262.102(d), TEXAS FAMILY CODE, TO BE REPRESENTED BY AN ATTORNEY. IF YOU ARE INDIGENT AND UNABLE TO AFFORD AN ATTORNEY, YOU HAVE THE RIGHT TO REQUEST THE APPOINTMENT OF AN ATTORNEY BY CONTACTING THE COURT AT 315th JUDICIAL DISTRICT COURT OF HARRIS COUNTY, THE JUVENILE JUSTICE CENTER, 1200 CONGRESS, HOUSTON Texas 77002 . IF YOU APPEAR IN OPPOSITION TO THE SUIT, CLAIM INDIGENCE, AND REQUEST THE APPOINTMENT OF AN ATTORNEY, THE COURT WILL REQUIRE YOU TO SIGN AN AFFIDAVIT OF INDIGENCE AND THE COURT MAY HEAR EVIDENCE TO DETERMINE IF YOU ARE INDIGENT. IF THE COURT DETERMINES YOU ARE INDIGENT AND ELIGIBLE FOR APPOINTMENT OF AN ATTORNEY, THE COURT WILL APPOINT AN ATTORNEY TO REPRESENT YOU."

17. **Dismissal Date and Notice of Status Hearing**

Pursuant to §263.306(11), Texas Family Code, the Court determines that the date for dismissal of this cause shall be _May 29, 2017_ .

IT IS ORDERED that this cause is set for a Status Hearing, pursuant to §263.201 Texas Family Code, on _August 24, 2016_ at _9:30_ o'clock _A_.m. in the _315_ Judicial District Court of Harris County in Houston, Texas.

18. All said TEMPORARY ORDERS shall continue in force during the pendency of this suit or until further order of the Court.

SIGNED this _____ day of **JUL 1 3 2016** _____, 2016.

_____
MASTER OF THE COURT

SIGNED this _____ day of **JUL 14 2016** _____, 2016.

_____
JUDGE PRESIDING

Certified Document Number: 71110358 - Page 12 of 13

NOTICE: THIS DOCUMENT
CONTAINS SENSITIVE DATA

MICHAEL EJEH 176-7
LOREE GEISELHART 176-7

CAUSE NO. 2016-03202J

IN THE INTEREST OF

J█████ I█ G█████
A█████ G█████

CHILDREN

IN THE DISTRICT COURT OF

HARRIS COUNTY, TEXAS

315TH JUDICIAL JUVENILE DISTRICT

## CERTIFICATE OF SERVICE REGARDING
## TRCP RULE 21 SERVICE OF ORDERS

Parties subject of this suit received or *will be sent* a true and correct copy of the above conformed order signed by this Court, or waived their right to receive it, as evidenced by their signature below.

**Sylvia Yvonne Escobedo**
Attorney and Guardian Ad Litem for the Children
FAX: 713-583-4877
   waived   by fax   hand delivery
   by Certified Mail, Return Receipt Requested
   no address known at this time

**Ryan J. Mitchell**
Attorney Ad Litem for the Mother, A███ M██ D███
FAX: 832-369-2919
   waived   by fax   hand delivery
   by Certified Mail, Return Receipt Requested
   no address known at this time

in accordance with the Texas Rules of Civil Procedure on ⎯07-13-2016⎯ .

**David S. Masquelette**
Attorney for the Petitioner

*Sharon Hubbard*
*by fax*

*Child Advocates, Inc.,*
*by fax.*

Certified Document Number: 71110358 - Page 13 of 13



I, Chris Daniel, District Clerk of Harris County, Texas certify that this is a true and correct copy of the original record filed and or recorded in my office, electronically or hard copy, as it appears on this date.
Witness my official hand and seal of office this   May 15, 2018

Certified Document Number:        71110358 Total Pages:  13

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**